ALUMINUM COMPANY OF AMERICA ET AL. *v.*
CENTRAL LINCOLN PEOPLES' UTILITY
DISTRICT ET AL.

No. 82–1071.   Argued January 9, 1984—Decided June 5, 1984

*M. Laurence Popofsky* argued the cause for petitioners. With him on the briefs were *Eric Redman, Peter A. Wald,* and *Dian M. Grueneich.*

*Jerrold J. Ganzfried* argued the cause for the federal respondents under this Court's Rule 19.6, urging reversal. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Claiborne,* and *Bruce G. Forrest.*

*Jay T. Waldron* argued the cause for respondents Central Lincoln Peoples' Utility District et al. With him on the brief was *Donald A. Haagensen. James W. Durham, Alvin Alexanderson,* and *Robert T. O'Leary* filed a brief for respondents Portland General Electric Co. et al. *Robert M. Greening, Jr.,* filed a brief for respondent Public Power Council.*

JUSTICE BLACKMUN delivered the opinion of the Court.

Since enactment of the Bonneville Project Act of 1937, 50 Stat. 731, 16 U. S. C. § 832 *et seq.* (Project Act), the Bonneville Power Administration (BPA) has marketed low-cost hydroelectric power generated by a series of dams along the Columbia River. Although § 4(a) of the Project Act, 16

---

*Briefs of *amici curiae* urging affirmance were filed for the American Public Power Association et al. by *Lee C. White* and *Grace Powers Monaco;* and for International Paper Co. et al. by *Donald P. Swisher* and *Allan M. Garten.*

U. S. C. §832c(a), directs the BPA Administrator to "give preference and priority to public bodies and cooperatives" when selling its power, BPA for many years enjoyed a surplus of power that allowed it to satisfy the needs of all customers in the region. As demand for power increased to exceed BPA's generating capability, however, the allocation of low-cost federal power became an issue of significant area concern. In 1980, Congress moved to avert what appeared to be an emerging customer struggle for BPA power by enacting the Pacific Northwest Electric Power Planning and Conservation Act, 94 Stat. 2697, 16 U. S. C. §839 *et seq.* (Regional Act). That Act required BPA to offer new contracts to its several customers. Some of the respondents[1] brought this suit to challenge the new contracts that BPA signed with certain customers. The United States Court of Appeals for the Ninth Circuit held that the contracts violated the statute. We now reverse that judgment, and remand the case to the Court of Appeals for further proceedings.

I

Before discussing the Regional Act's provisions that give rise to the dispute, certain aspects of hydroelectric power generation and the Project Act's allocation scheme must be explained.

Because the amount of power generated by BPA depends on streamflow in the Columbia River system, BPA cannot predict with accuracy the amount of power that it can generate. Accordingly, BPA historically has sold two types of power. "Firm power" is energy that BPA expects to produce under predictable streamflow conditions. "Nonfirm" power is energy in excess of firm power, and is provided only when such excess exists.

---

[1] Throughout this opinion, the term "respondents" is used to refer only to those parties who support the Court of Appeals' judgment. The term does not include the Administrator of BPA and the Secretary of the Department of Energy, who nominally are respondents in this case even though they urge reversal of the judgment below.

BPA's customers include three groups that are relevant to this case.[2] The primary group is what the Project Act refers to as "public bodies and cooperatives," which includes public utilities and other public entities.[3] These entities are "preference" customers, and BPA is required to give priority to their applications for power when competing applications from nonpreference customers are received. See § 4(b) of the Project Act, 16 U. S. C. § 832c(b). BPA's other two groups of customers are private, investor-owned utilities (IOUs), and direct-service industrial customers (DSIs). The latter are large industrial end-users that purchase power directly from BPA instead of through a utility. IOUs and DSIs are "nonpreference" customers, and BPA is allowed to contract to sell to them only power for which preference customers do not apply. Once a contract between BPA and a customer is signed, however, the Project Act makes clear that the contract is "binding in accordance with the terms thereof." § 5(a), 16 U. S. C. § 832d(a).

In the early years of the Project Act, BPA's contract with each of its customers obligated BPA to supply the customer's full contractual requirements on a "firm," noninterruptible basis. In 1948, the increasing demand for power in the Northwest caused BPA to modify its industrial sales policy so as to require that, where feasible, a new contract signed with a DSI provide that some power be supplied on a nonfirm basis. This condition meant that a portion of DSI power could be interrupted when necessary to supply BPA's prefer-

---

[2] In addition to the three relevant customer categories, BPA is also authorized to sell power to federal agencies in the region. See § 5(b)(3) of the Regional Act, 16 U. S. C. § 839c(b)(3). Sales to such agencies have no pertinency for this litigation.

[3] Section 3 of the Project Act, 16 U. S. C. § 832b, defines "public bodies" as "States, public power districts, counties, and municipalities, including agencies or subdivisions of any thereof." It defines "cooperatives" as "nonprofit-making . . . organizations of citizens supplying . . . members with any kind of goods, commodities, or services, as nearly as possible at cost."

ence customers. DSIs are unique among BPA's customers in their ability to tolerate such interruptions in service; they are able to do so because some of their industrial processes can withstand periodic power interruptions without damage. Utilities, on the other hand, require power on a noninterruptible basis because their residential consumers cannot withstand periodic interruptions in service.

The increased demand for power in the 1970's required that BPA alter its sales policies even more drastically. Projections at that time showed that because of increased power demand, preference customers soon would require all of BPA's power. See H. R. Rep. No. 96–976, pt. 1, pp. 23–27 (1980). Accordingly, BPA announced in 1973 that new contracts for firm power sales to IOUs would not be offered. In addition, when BPA signed contracts with DSIs in 1975, it specified that 25% of their power would be subject to interruption "at any time," and it advised the DSIs that as their new contracts expired during the 1981–1991 period, they were not likely to be renewed.

The increase in demand soon threatened even the ability of BPA's preference customers to obtain federal power to meet their full power needs. In 1976, BPA informed its preference customers that BPA would not be able to satisfy preference customer load growth after July 1, 1983, and BPA began to consider how to divide the available federal power among its preference customers.

The high cost of alternative sources of power caused BPA's nonpreference customers vigorously to pursue ways to regain access to cheap federal power. Most important, many areas that were served by IOUs moved to establish public entities designed to qualify as preference customers and be eligible for administrative allocations of power.[4] Because the

---

[4] Because of the preference accorded public utilities over private ones, those States that had a relatively large proportion of public utilities benefited from the federal power more than the States in which most consumers were served by IOUs. Although 80% of the consumers in the State of

Project Act provided no clear way of allocating among preference customers, and because the stakes involved in buying cheap federal power had become very high, this competition for administrative allocations threatened to produce contentious litigation. The uncertainty inherent in the situation greatly complicated the efforts by all BPA customers to plan for their future power needs.

To avoid the prospect of unproductive and endless litigation, Congress enacted the Regional Act. The Act provided for future cooperation in the region by establishing a mechanism for comprehensive federal/state power planning. §§ 4 and 6, 16 U. S. C. §§ 839b and 839d. For the first time, moreover, BPA was authorized to acquire resources to increase the supply of federal power.[5] In addition, § 5 of the Act, 16 U. S. C. § 839c, sought to avert disputes over the allocation of power by requiring BPA to enter into an initial set of contracts with its various types of customers.

Section 5(d)(1)(B) of the Act, 16 U. S. C. § 839c(d)(1)(B), required that "[a]fter the effective date of this Act [Dec. 5, 1980], the Administrator shall offer . . . to each existing direct service industrial customer an initial long term contract that provides such customer an amount of power equivalent to that to which such customer is entitled under its contract dated January or April 1975 . . . ." These contracts were to

Washington had access to BPA power because they were served by preference customers, only 20% of the consumers in Oregon had access to such power. See Pacific Northwest Electric Power Supply and Conservation: Hearings on H. R. 9020, H. R. 9664, and H. R. 5862 before the Subcommittee on Water and Power Resources of the House Committee on Interior and Insular Affairs, 95th Cong., 1st Sess., pt. 3, p. 9 (1977).

[5] Under the Project Act, BPA did not have authority to own, construct, or purchase the output or capability of electricity generating plants except to meet short-term deficiencies; BPA was entirely a marketing agency that disposed of power generated at dams constructed by the Army Corps of Engineers and what was then called the Bureau of Reclamation (now the Water and Power Resources Service). See H. R. Rep. No. 96–976, pt. 2, pp. 26–27 (1980).

replace the existing DSI contracts that were scheduled to expire at various times during the period 1981–1991. Section 5(d)(1)(A) indicated that the sales to the DSIs under the new contracts were to "provide a portion of the Administrator's reserves for firm power loads within the region."[6]

Pursuant to this statutory directive, the Administrator offered new, 20-year contracts to its DSI customers. The contracts were for the same amount of power specified by the existing 1975 contracts. Based upon his interpretation of the statute and the legislative history of the Act, however, the Administrator concluded that the terms of the power sales were not to be the same as they had been under the 1975 contracts. The 1975 contracts provided that a portion (the "top quartile") of the power supplied to DSIs could be interrupted "at any time." This provision made the top quartile of DSI power subject to the preference provisions of the Project Act, and enabled preference utilities to interrupt it whenever they wanted nonfirm power. The Administrator concluded that such a provision in the new contracts would conflict with § 5(d)(1)(A)'s directive that sales to DSIs should "provide a portion of the Administrator's reserves for *firm* power loads" (emphasis added). Accordingly, the Administrator offered DSI customers contracts that allowed interruption only to protect BPA's firm loads, and not to make sales of nonfirm energy. 46 Fed. Reg. 44340 (1981).

This aspect of the new DSI contracts is at the center of the present dispute. Under the Project Act, nonfirm power was allocated hourly on an "if available basis," and was subject to the preference provisions of that Act. Although nonfirm power is too unreliable for preference utilities to use to satisfy the demands of their consumers on a general basis, it nevertheless is attractive to many preference utilities be-

---

[6] The statute defines "reserves" as "the electric power needed to avert particular planning or operating shortages for the benefit of *firm* power customers . . . ." § 3(17), 16 U. S. C. § 839a(17) (emphasis added).

cause it could be used as a substitute for power they generated themselves. In this manner, nonfirm power purchases enabled preference utilities to shut down their own facilities when they required maintenance, or if they could not generate power as cheaply as BPA. Alternatively, preference utilities appear to have been able to "arbitrage" BPA's nonfirm power by using it to displace their own power, which they then sold to users that could not purchase power directly from BPA.[7] By making DSI power interruptible under the new contracts only to protect BPA's firm power obligations, the new contracts reduced the amount of nonfirm power available to preference utilities.

Shortly after the Administrator's decision and the execution of new DSI agreements, respondents challenged the contracts by petition for review in the Court of Appeals. The core of their challenge was that the proposed contracts violated the preference to nonfirm power accorded under the 1975 contracts. That preference, it was said, was reserved by § 5(a) of the Regional Act, 16 U. S. C. § 839c, which states: "All power sales under this Act shall be subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 . . . ." Respondents also relied on § 10(c) of the Regional Act, 16 U. S. C. § 839g(c), which provides that the Act does not "alter, diminish, abridge, or otherwise affect the provisions of other Federal laws by which

---

[7] Respondents' discussion of this use of nonfirm power seems to us to be somewhat less than persuasive. The parties agree that the direct resale of BPA power by preference customers is prohibited. Petitioners contend, however, that respondents can and do use nonfirm federal power to displace their own power, which they can resell to other users. See Brief for Petitioners 47; Reply Brief for Petitioners 18, n. 58. Respondents do not specifically deny this, and simply emphasize their "other uses" for nonfirm power and the fact that they use the BPA power to serve their customers. See Brief for Respondent Public Power Council 20–21; Brief for Respondents Central Lincoln Peoples' Utility District et al. 9, n. 25. We therefore take respondents to have conceded that they do arbitrage the nonfirm BPA power.

public bodies and cooperatives are entitled to preference and priority in the sale of federally generated electric power." Respondents argue that these provisions require that DSI power be interruptible under the new contracts on the same terms as it was under the 1975 contracts. In addition, respondents assert that the conditions in the new contracts effectively provide the DSIs with a greater "amount of power" than their 1975 contracts, in violation of § 5(d)(1)(B) of the Regional Act, 16 U. S. C. § 839c(d)(1)(B).

The Court of Appeals agreed with respondents and found the Administrator's interpretation of the Act to be unreasonable. *Central Lincoln Peoples' Utility District* v. *Johnson*, 686 F. 2d 708 (CA9 1982). The court relied heavily on §§ 5(a) and 10(c) of the Regional Act to conclude that the Act preserved the longstanding practice of allocating nonfirm power under the 1975 contracts. Because of the importance of the issue, we granted certiorari. 460 U. S. 1050 (1983).

## II

### A

Under established administrative law principles, it is clear that the Administrator's interpretation of the Regional Act is to be given great weight. "We have often noted that the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." *Blum* v. *Bacon*, 457 U. S. 132, 141 (1982). "To uphold [the agency's interpretation] 'we need not find that [its] construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' . . . We need only conclude that it is *a* reasonable interpretation of the relevant provisions." *American Paper Institute, Inc.* v. *American Electric Power Service Corp.*, 461 U. S. 402, 422–423 (1983), quoting *Unemployment Compensation Comm'n* v. *Aragon*, 329 U. S. 143, 153 (1946).

These principles of deference have particular force in the context of this case. The subject under regulation is technical and complex. BPA has longstanding expertise in the area, and was intimately involved in the drafting and consideration of the statute by Congress. Following enactment of the statute, the agency immediately interpreted the statute in the manner now under challenge. Thus, BPA's interpretation represents " 'a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' " *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965), quoting *Power Reactor Co.* v. *Electricians*, 367 U. S. 396, 408 (1961).

Giving the Administrator's interpretation the deference that it is due, we are convinced that his interpretation is a fully reasonable one. Section 5(d)(1)(B) of the Regional Act, 16 U. S. C. § 839c(d)(1)(B), expressly directs the Administrator to offer each existing DSI an initial long-term contract for the same amount of power as provided in its existing contract. It is therefore beyond dispute that the plain language of the statute mandates that contracts be offered. Respondents challenge the contracts, however, because they contain interruptibility provisions different from those in the 1975 contracts. Respondents offer essentially two arguments in support of their position. Neither is persuasive.

First, respondents claim that the new contracts violate the statutory directive that the contracts be for the same "amount of power" as the 1975 contracts. Because the proposed contracts curtail the situations in which power can be interrupted, respondents argue that they effectively provide DSIs with a greater amount of power than they would have received under the 1975 contracts. Petitioners and the Administrator contend, on the other hand, that the term "amount of power" refers only to the quantity of power to be sold to the DSIs as measured in kilowatts. They claim that the phrase does not determine the interruptibility or "quality" of the power that is sold under the required contracts.

The distinction between power amount and power "quality" is a valid one that can be seen by reference to the 1975 contracts. Under those contracts, the "amount" of power referred simply to the number of kilowatts sold. The contractual terms governing the interruptibility of the power were included in other provisions in the contracts. See contract between BPA and Kaiser Aluminum & Chemical Corp. (1975), App. to Pet. for Cert. N–2, N–5. It is reasonable to conclude that the statutory directive that the new contracts be for the same "amount of power" as the 1975 contracts requires simply that the new contracts involve the same number of kilowatts. Respondents do not contend that the new contracts fail to meet this requirement.

Sections 5(d)(1)(A) and 3(17) of the Regional Act lend support to this interpretation. The former expressly requires that power sales to the DSIs "shall provide a portion of the Administrator's reserves for firm power loads." The latter defines reserves as the power needed to protect BPA's "firm power customers" from shortages. It is clear from these provisions that at least some portion of DSI power is interruptible to protect the firm needs of other customers. In addition, however, these provisions support the Administrator's inference that the Regional Act does not require DSI power to be interruptible to meet the nonfirm power desires of preference customers, and the legislative history confirms this view. The Report of the Senate Committee on Energy and Natural Resources clearly explains: "[T]he term 'firm power customers of the Administrator' is intended to mean the firm power loads of such customers. *It is not intended that the Administrator's reserves will be used to protect other than firm loads*" (emphasis supplied). S. Rep. No. 96–272, p. 23 (1979). Because it is clear that the top quartile of DSI power is a part of BPA's reserves, that power is not to be used to serve nonfirm power loads.

Respondents' claim that the top quartile of power must be interruptible "at any time" in order to provide the DSIs with the same "amount of power" is incorrect even under respond-

ents' own interpretation of the phrase. The parties agree that the DSIs' *second quartile* of power can be interrupted in more situations under the new contracts than under the 1975 contracts, and that the power quality of the second quartile is therefore lower than before. See Respondents' Memorandum in Opposition to Motion for Temporary Injunction or Stay Pending Review, filed Sept. 8, 1981, App. 21 (table comparing interruptibility of second quartile of DSI power in 1975 and new contracts). The legislative history of the Regional Act makes clear that Congress expressly endorsed, perhaps even required, that the new contracts contain the conditions making the second quartile power more interruptible than before.[8] If, as respondents would have it, the top

---

[8] The House Interior and Insular Affairs Committee Report, for example, expressly stated that the second quartile under the new contracts, "will provide a planning reserve to protect the Administrator's firm loads against the delayed completion or unexpectedly poor performance of regional generating resources or conservation measures implemented or acquired by BPA." H. R. Rep. No. 96–976, pt. 2, p. 48 (1980). The language in this Report is copied verbatim from a letter written by the BPA Administrator to the House Subcommittee explaining how BPA would serve the DSI load under the Regional Act. See Appendix III to Letter dated Aug. 19, 1980, from BPA Administrator to Rep. Kazen, Chairman, House Subcommittee on Water and Power Resources, App. to Pet. for Cert. I–23. A similar statement is in the Senate Report. S. Rep. No. 96–272, p. 28 (1979). The second quartile interruptibility provisions described similarly in all of these passages differ from those in the 1975 contracts.

The dissent apparently concedes that the second quartile interruptibility provisions of the new contracts differ from those in the 1975 contracts, *post*, at 403–405, and the dissent is presumably aware of the legislative history specifically endorsing the new provisions. Thus, the dissent acknowledges that its interpretation of the phrase "same amount of power" leads to an inconsistency, but claims that Congress was not "aware that it was *altering* the interruptibility provisions" (emphasis supplied), apparently assuming that Congress simply forgot what was in the 1975 contracts. It seems improvident to assume such ignorance on the part of Congress, not to mention the Administrator of BPA, when Congress clearly had to focus on the terms of the 1975 contracts in drafting several aspects of the statute.

quartile of power remained interruptible in the same situations as under the 1975 contracts, but the second quartile became more interruptible than before, it is apparent that the new contracts would provide the DSIs with a smaller total "amount of power," as respondents seek to define that phrase. In short, Congress could not have contemplated interruptibility terms for the second quartile different from those in the 1975 contracts, and at the same time have insisted that DSIs get the "same amount of power" under respondents' definition of the phrase; it is clear therefore, that that definition is not what Congress intended.

Respondents' second argument is that the terms of the new contracts conflict with § 5(a) of the Regional Act. It is true, as respondents assert, that that section preserves the priority and preference provisions that existed under the Project Act. But the preference system merely determines the priority of different customers when the Administrator receives "conflicting or competing" applications for power that the Administrator is authorized to allocate administratively. § 4(b) of the Project Act, 16 U. S. C. § 832c(b). In the instant case, the initial contracts offered by the Administrator to the DSIs are not part of an administrative allocation of power. The power sold pursuant to those contracts is allocated directly by the statute. Because there is no administrative allocation of power, there can be no competing applications. The preference provisions of the Project Act as incorporated into the Regional Act therefore simply do not apply to the initial contracts that the statute requires the BPA to offer.[9]

---

[9] The reliance by respondents and the Court of Appeals on § 10(c) of the Regional Act, 16 U. S. C. § 839g(c), is similarly misplaced. Section 10 is entitled "Savings Provisions." The purpose of § 10(c) was to reassure preference customers in other regions of the country who feared that the Regional Act—by statutorily allocating power directly to nonpreference customers—would set a precedent that would weaken the commitment to preference that exists in other statutes governing the sale of federal power generated in other regions. See H. R. Rep. No. 96–976, pt. 1, pp. 34–35 (1980); cf. 126 Cong. Rec. 29803 (1980) (remarks of Rep. Udall). That section thus is irrelevant to the issue in this case.

Respondents' argument that power sold to DSIs under the new contracts is subject to preference implicitly proves too much. There is nothing in either the rules governing preference or the Project Act that distinguishes the top quartile of DSI power from the other three quartiles. Under the 1975 contracts, the difference between the top quartile and the other quartiles was the provision in those contracts that made the top quartile subject to interruption "at any time." That contract term allowed the Administrator to treat the top quartile of power as if it were uncommitted, and subjected it to preference. The other three quartiles were not subject to preference simply because the terms of the contracts did not so provide. Thus, the distinction among the different quartiles under the 1975 contracts was a product of the terms of the contracts, not a requirement of the Project Act's preference provisions. There is likewise nothing in the Regional Act that distinguishes between the top quartile and the other quartiles for purposes of applying preference when offering the new DSI contracts. If respondents are correct that the power sold to the DSIs under the new contracts is subject to preference, then respondents have preference not only for power in the top quartile, but for the other three quartiles as well. For as long as that power is uncommitted, the preference provisions apply. Once committed by contract, the interruptibility of the power is determined by the terms of the contract. §5a, 16 U. S. C. §832d(a).

It appears, therefore, that respondents' view of the Regional Act would render meaningless the initial contracts contemplated by §5(d)(1)(B). Respondents' argument is essentially that the allocation of power under the mandated contracts should be the same as it would be if the preference rules applied. But Congress presumably included §5(d)(1)(B) precisely because it wanted to achieve an allocation of power that differs from what allocation by preference

would produce; preference was the perceived problem, not the chosen solution.[10]

The Administrator's interpretation of the Regional Act also is supported by § 5(g)(7) of that Act, 16 U. S. C. § 839c(g)(7). That section "deem[s]" the Administrator "to have sufficient resources for the purpose of entering into the initial contracts" mandated by the statute. Through this express legal fiction, Congress ensured that the initial contracts could not be challenged by a claim that BPA lacked the power to enter into contracts with nonpreference customers. Congress clearly intended BPA to offer the DSI contracts even if that necessitated the acquisition by BPA of additional power through outside purchases and construction of new generating facilities. If preference were to apply to the initial contracts, however, they could be executed only after preference customers have purchased all the power they desire. Such a condition would be truly incongruous, for it could require BPA to obtain an almost unlimited amount of power. When Congress "deemed" the Administrator "to have sufficient resources for the purpose of entering into the initial contracts specified" by the Act, it is only sensible to assume that Congress intended such contracts to be made without regard to the preference rules that govern sales that are not statutorily mandated.

---

[10] To say that the preference provisions do not apply to the initial set of contracts does not make preference meaningless. As was the case prior to the Regional Act, preference continues to govern the allocation of all power that is not committed by contract. Thus, the preference rules will apply to any subsequent contracts made with DSIs. Even during the period of the initial contracts, the preference provisions apply to any surplus power that exists. See 16 U. S. C. § 839c(f). Such surplus might exist, for example, because of especially high annual or seasonal streamflow fluctuations, or because BPA's power acquisition program secures additional power faster than BPA's increasing contractual commitments. See Mellem, Darkness to Dawn? Generating and Conserving Electricity in the Pacific Northwest: A Primer on the Northwest Power Act, 58 Wash. L. Rev. 245, 269–273 (1983).

## B

The legislative history of the Regional Act confirms the interpretation put forward by BPA and petitioners. That history shows that Congress paid specific attention to power sales to DSIs, and consulted BPA on the relationship between those sales and the broader purposes of the Act. The record gives no indication that Congress intended the new DSI contracts to have provisions governing interruptibility that were the same as in the 1975 contracts.

The Committee Reports of both Houses made particular reference to the DSI contracts and the manner in which those sales would provide the reserves for the Administrator's other obligations. The Senate Report contains the following explanation of the section dealing with DSI sales.

> "*The power quality provided the direct-service industries is determined by the reserve obligations set forth in their contracts in order to protect service to firm loads of the Administrator.* It is intended that these contracts at least provide peaking power reserves similar to those provided in the present contracts, and that the energy reserves shall include a reserve approximately equal to 25 percent of the direct service industrial load *to protect firm loads* for any reason, including low or critical streamflow conditions . . ." (emphasis supplied). S. Rep. No. 96–272, p. 28 (1979).

This passage flatly contradicts respondents' argument. The first sentence makes clear that the "quality" of the power provided to the DSIs is determined by the need to provide reserves to protect "the firm loads of the Administrator." The sentence is noticeably devoid of any suggestion that the quality of power is to be the same as it was under the 1975 contracts. The rest of the passage reinforces the view that the purpose of the interruptibility provisions is "to protect firm loads."

The House Report indicates a similar understanding:

> "Approximately 25 percent of the DSI load is to be treated as a firm load for purposes of resource operation and will provide an operating reserve that may be restricted by the BPA at any time in order to protect the Administrator's firm loads within the region and for any reason, including low or critical streamflow conditions and unanticipated growth of regional firm loads." H. R. Rep. No. 96–976, pt. 2, p. 48 (1980).

This passage confirms that DSI sales were to be interruptible "to protect the Administrator's firm loads." Such a requirement would have little meaning if, as respondents would have it, the statute also requires DSI power to be interruptible at any time for any reason.

The source of this language in the House Report is significant. While the bill was still under consideration, BPA conferred with the Committee's staff and furnished the Committee with its understanding of how sales to DSIs would operate. The passage from the Report quoted above is an almost verbatim incorporation of BPA's understanding of the provision. See Appendix III to Letter dated Aug. 19, 1980, from BPA Administrator to Rep. Kazen, Chairman, House Subcommittee on Water and Power Resources, App. to Pet. for Cert. I–23 (discussing the DSI service under the Regional Act). The legislative history therefore indicates that BPA consulted with Congress during the consideration of the Regional Act, and that BPA and Congress shared an understanding of the terms on which the Administrator would sell power to DSIs under the Act.

Respondents rely on the legislative history to establish two points, neither of which is controverted. First, respondents use the legislative history to demonstrate what § 5(a) already makes clear—that the Regional Act does not alter the priority provisions of the Project Act. See Brief for Respondents

Central Lincoln Peoples' Utility District et al. 23–30. Petitioners and the Administrator do not contest this point. But the issue in this case is not whether the preference rules have been changed; the issue is whether the preference rules apply to power that the statute requires BPA to sell to DSIs. Because it is clear that the power sold under the initial contracts is committed to DSIs by statute, it is equally clear that it is not uncommitted power to which preference applies.

Respondents' second use of the legislative history is to show that, under the 1975 contracts, the top quartile of DSI was subject to preference because it was interruptible "at any time." *Id.*, at 21–23. This point also is uncontroverted. The issue in this case, however, is whether the new contracts mandated by the Regional Act must provide that a portion of DSI power be subject to interruption "at any time." If so, there is no dispute over whether preference would apply to that power. But respondents have not pointed to anything in the Regional Act that requires that the interruptibility terms of the 1975 contracts be incorporated into the new contracts.

C

Because the Regional Act does not comprehensively establish the terms on which power is to be supplied to DSIs under the new contracts, it is our view that the Administrator has broad discretion to negotiate them. Such discretion is especially appropriate in this situation, because DSI sales are merely one part of a complicated statutory allocation plan designed to achieve several goals. Most important, sales to DSIs under the Regional Act are intricately related to the "exchange" program established by the Regional Act on behalf of nonpreference utilities. § 5(c), 16 U. S. C. § 839c(c).

The exchange program is designed to provide rate relief for consumers served by IOUs. As noted *supra*, the operation of preference under the Project Act produced an allocation of cheap federal power that heavily favored public

utilities (preference customers) over private utilities (non-preference customers). As a consequence, consumers that lived in areas served by public utilities enjoyed much cheaper power than consumers served by IOUs. The exchange program operates to reduce this disparity. Very briefly, the program consists of an "exchange" arrangement under which IOUs are allowed to sell power to BPA at their average system cost, and then purchase from BPA an equal quantity of cheaper federal power. The benefits to the IOUs under this program are to be passed on directly to residential consumers.

Because this exchange program essentially requires BPA to trade its cheap power for more expensive power, it is obviously a money-losing program for BPA. The Act expressly contemplates that much of the cost of this program is to be covered by power sales to DSIs, which pay a considerably higher price for power than other users. Section 7(c)(1), 16 U. S. C. §839e(c)(1), expressly directs the Administrator initially to charge the DSIs a rate "sufficient to [cover] the net costs incurred by the Administrator" under the exchange program. The House Report explained the interrelationship between sales to DSIs and the exchange program in some detail:

> "[The DSIs] will also pay significantly higher rates under the new contracts. These higher rates permit the Administrator to enter into contracts with the region's investor-owned utilities for an exchange of power equal to the utilities' residential load. This exchange will permit residential customers of investor-owned utilities to share in the benefits of the lower-cost Federal resources. The power sold to BPA will be sold at the utilities' average system cost and purchased back at the rate paid by the preference customers' utilization [sic] their general requirements. The loss in revenue to the Administrator is in effect returned by the higher direct service industry rates. By providing these residential customers whole-

sale rate parity with residential customers of preference utilities, the amendment serves in a substantial way to cure a major part of the allocation problem." H. R. Rep. No. 96–976, pt. 1, p. 29 (1980).

This passage makes clear that the DSI sales and the power exchange program are integrally related. BPA's ability to finance the exchange program is related to the amount of power that BPAs sell to DSIs, which in turn is determined by the interruptibility terms of the new DSI contracts. It is the responsibility of the Administrator to manage the complex relationship among these various aspects of the statute, and, absent an express statutory statement requiring particular terms in the contracts, it is appropriate that we give him broad discretion to determine them.[11]

## III

For the foregoing reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.[12]

*It is so ordered.*

JUSTICE STEVENS, dissenting.

Section 5(d)(1)(B) of the Pacific Northwest Electric Power Planning and Conservation Act of 1980, 94 Stat. 2697, provides:

"[T]he Administrator shall offer in accordance with subsection (g) of this section to each existing direct service

---

[11] In holding that the Regional Act does not require that DSI power be interruptible to serve the nonfirm power needs of preference customers, we do not decide whether the Administrator could negotiate for such a condition if he concluded that it would serve the purposes of the Act.

[12] One set of respondents argues that we should affirm the Court of Appeals' judgment, but narrow its scope. See Brief for Portland General Electric Company et al. Given our disposition of the case, we necessarily reject that argument.

industrial customer an initial long term contract that provides such customer an amount of power equivalent to that to which such customer is entitled under its contract dated January or April 1975 providing for the sale of 'industrial firm power.'"  16 U. S. C. § 839c(d)(1)(B).

The critical question in this case is whether the contracts offered by the Administrator of the Bonneville Power Administration (BPA) pursuant to the 1980 Act are for "an amount of power equivalent to" the amount to which the direct service industrial customers (DSIs) were entitled under their 1975 contracts.

Under the 1975 contracts, 75 percent of the specified amount of power was virtually guaranteed; the "top quartile," however, was subject to interruption at any time to meet the demands of preference customers.  Thus, the actual amount of power delivered under the 1975 contracts was an amount somewhere between 75 percent and 100 percent of the amount stated in the contracts.[1]

Under the 1980 contracts, 100 percent of the specified amounts is virtually guaranteed.  No longer is the first quartile subject to interruption at any time.  The result of changing the "quality" of first quartile power is to provide the DSIs with a larger amount of power than they would have received under the 1975 contracts.  That is plainly inconsistent with § 5(d)(1)(B), which indicates that the DSIs'

"contracts will provide power in amounts equal to, *but not greater than*, that which these companies are now entitled under existing contracts with BPA, and the terms of these contracts will require that these compa-

---

[1] Apparently only about two-thirds of the first quartile load was being delivered to the DSIs during the years preceding the passage of the 1980 Act.  See App. 36.  Thus, it would seem that the amount of power actually delivered to those customers was approximately 91 percent of the stated contract amounts.

nies continue to supply reserves for the region."   H. R.
Rep. No. 96–976, pt. 2, p. 29 (1980) (emphasis supplied).[2]

Thus, the new contracts do not comply with the plain language of the 1980 Act.[3]

---

[2] The passage from the Senate Report quoted by the majority *ante,* at 396, when read in context, is inconsistent with the majority's conclusion that DSIs have greater protection against interruption under the 1980 Act than under their 1975 contracts:

"The power quality provided the direct-service industries is determined by the reserve obligations set forth in their contracts in order to protect service to firm loads of the Administrator.   It is intended that these contracts at least provide peaking power reserves similar to those provided in the present contracts, and that the energy reserves shall include a reserve approximately equal to 25 percent of the direct service industrial load to protect firm loads for any reason, including low or critical streamflow conditions, and an additional energy reserve of approxiamtely *[sic]* the same amount to protect firm loads against the delayed completition *[sic]* or unexpectedly poor performance of reginal *[sic]* generating resources or conservation measures, and against the unanticipated growth of regional firm loads.   One intended result of these procedures is that there will be no increase in firm power commitments to the direct service industrial customs *[sic]*, except for technological improvements purposes."   S. Rep. No. 96–272, p. 28 (1980).

When read in light of its last sentence, this paragraph makes it clear that Congress intended that DSIs have no greater assurance against interruption than they did under their 1975 contracts.   Moreover, in a rate analysis submitted to Congress by the BPA, it estimated its projected revenues under the proposed legislation by assuming that it would continue to interrupt the top quartile of DSIs' power at the same rate that it had done so in the past, n. 1, *supra,* supplying from 86 to 96 percent of the DSIs' loads, and also anticipated interruptions in the top quartile in excess of those necessary to protect firm loads.   See S. Rep. No. 96–272, at 59.

[3] To the extent that the Court relies on "deference" to the Administrator's interpretation of the 1980 Act, *ante,* at 390, it must be borne in mind that what is at issue here is the agency's construction of a statute:

"The interpretation put on the statute by the agency charged with administering it is entitled to deference, but the courts are the final authorities on issues of statutory construction.   They must reject administrative constructions of a statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.   Accordingly, the crucial issue at

The Court attempts to square its holding with the language of the statute by drawing a distinction between the "quantity" of power offered and its "quality." The Court believes that while § 5(d)(1)(B) requires the same quantity of power to be offered to DSIs as was offered in 1975, § 5(d)(1)(A) requires that the "quality" of the power be higher than under the 1975 contracts; under the 1980 Act the top quartile of power provided to DSIs is of a higher "quality" since it can be interrupted only for firm power loads. *Ante,* at 390–391. The proffered distinction between the "quantity" and "quality" of power is nonexistent, however. Kilowatts are fungible. Interruptibility is significant not because it affects the "quality" of power a customer receives, but because it affects the amount of power a customer receives. Under the challenged contracts DSIs receive power that is less freely interruptible than it was under their 1975 contracts; hence they are now entitled to a greater "amount of power" than they were under their 1975 contracts. That result violates the plain language of § 5(d)(1)(B).

In the 1981 contracts the DSIs agreed that the *second* quartile of power would be subject to interruption on two contingencies that were not applicable to the second quartile

---

the outset is whether the Court of Appeals correctly construed the Act." *FEC* v. *Democratic Senatorial Campaign Comm.,* 454 U. S. 27, 31–32 (1981) (citations omitted).

It is also worth noting that the Adminstrator's interpretation of this Act has not been a model of consistency. In the BPA's final Environmental Impact Statement, issued in December 1980, it stated that top quartile DSI power can be interrupted "[a]t any time for any period for any reason." App. 31. Similarly, in its summary of its original draft contracts under the 1980 Act, it stated: "BPA may interrupt a portion of the DSI load, not to exceed 25 percent of the Operating Demand plus the Auxiliary Power, at any time, for any reason, and for any duration." *Id.,* at 74. See also n. 2, *supra.* In light of the lack of clarity that has characterized BPA's position both before and after the passage of the 1980 Act, its position surely is not entitled to so much deference as to override the plain import of the words Congress enacted. See *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 143 (1976).

under the 1975 contracts. They therefore argue and the Court concludes, *ante,* at 390–391, that since respondents do not object to the fact that the second quartile under the 1980 contracts is of a different quality than under the 1975 contracts, respondents must accept the conclusion that "quality" has a meaning different from quantity. But it was after the Act was passed that the Administrator and the DSIs agreed upon a new contract that provided the DSIs with substantially more first quartile power with a fairly remote possibility of a lesser amount of second quartile power. The net result of the trade-off is still to give the DSIs significantly greater contractual entitlements than they had under the 1975 contracts. Whatever the actual comparison between the second quartile provisions of the 1975 and 1981 contracts, this argument tells us nothing about the intent of Congress since the legislative history contains no indication that Congress was aware that it was altering the interruptibility provisions of either the first or second quartiles. To the contrary, the legislative history indicates that Congress thought it was not altering the DSIs' entitlement to power. See n. 2, *supra.*

Moreover, it is questionable whether the second quartile interruptibility provisions of the 1980 Act constitute a real difference from the interruptibility provisions of the 1975 contracts with respect to that quartile. As the majority explains, *ante,* at 392, n. 8, the 1980 Act anticipated interruption of the second quartile only because of delayed completion or unexpectedly poor performance of generating resources or conservation measures. Prior to the 1980 Act, BPA had no authority to acquire or expand its resources; its function was merely to market power generated at dams constructed by the Army Corps of Engineers. See *ante,* at 386, and n. 5. Hence, the 1980 Act permits second quartile interruption only on a basis that *would not have arisen* under the 1975 contracts.[4] Surely this relatively insignificant and some-

---

[4] Even if the issue would have arisen under the 1975 contracts, it is doubtful that the DSIs would have been entitled to second quartile power

what esoteric modification of the second quartile provisions is less persuasive evidence of congressional intent than the plain language of the statute itself.

The language of § 5(d)(1)(A) should be of little comfort to the majority. All it says is:

> "The Administrator is authorized to sell in accordance with this subsection electric power to existing direct service industrial customers. Such sales shall provide a portion of the Administrator's reserves for firm power loads within the region." 16 U. S. C. § 839c(d)(1)(A).[5]

This subsection makes no reference at all to the "quality" of power to which DSIs are entitled. If this language was designed to entitle DSIs to higher "quality" power than they received under their 1975 contracts, then Congress picked a rather obtuse way of expressing the idea.

I read the subsection to mean what it says. The sales that the Administrator makes to the DSIs are part of the reserve for firm power loads.[6] In the event of a shortfall, the Administrator is obligated to use top quartile DSI power to meet his firm power obligations even when there is a prefer-

---

in the circumstances in which interruption is permitted under the 1980 Act; those circumstances most likely would have given rise to a commercial frustration defense permitting BPA to interrupt second quartile power to the DSIs.

[5] Section 3(17) of the Act defines "reserves":

"'Reserves' means the electric power needed to avert particular planning or operating shortages for the benefit of firm power customers of the Administrator (A) from resources or (B) from rights to interrupt, curtail, or otherwise withdraw, as provided by specific contract provisions, portions of the electric power supplied to customers." 16 U. S. C. § 839a(17).

[6] The legislative history of § 5(d)(1)(A), of which the Court makes so much, *ante*, at 396–397, does not demonstrate that the statute means something other than what it says. The passages from the Committee Reports on the Act quoted by the majority state that the Administrator must treat the top quartile as a reserve to protect firm loads. That he has surely done. But it does not speak to whether that quartile is interruptible to meet the needs of preference customers. See also n. 2, *supra*.

ence customer seeking to purchase power; in this respect § 5(d)(1)(A) was necessary to change the law with respect to the rights of preference customers, which would otherwise have had priority even over purchasers of firm power.[7] But a provision ordering the Administrator to use top quartile power as a reserve for firm loads sheds no light on the extent of his obligation to sell power to the DSIs. That obligation is governed not by § 5(d)(1)(A), but by § 5(d)(1)(B).[8]

Because I find nothing in the statute or in its legislative history to indicate that Congress intended to allocate a greater amount of power to the DSIs than they were entitled to receive under their 1975 contracts, I cannot square the Court's holding with the plain language of the statute. I therefore respectfully dissent.

---

[7] Prior to the passage of the 1980 Act, the Ninth Circuit had construed preference provisions to prohibit the sale of power to a private customer whenever there is a preference customer willing to buy it. See *City of Santa Clara* v. *Andrus*, 572 F. 2d 660, 670–671 (CA9), cert. denied, 439 U. S. 859 (1978); *Arizona Power Pooling Assn.* v. *Morton*, 527 F. 2d 721, 727–728 (CA9 1975), cert. denied, 425 U. S. 911 (1976).

[8] In Part II–C of its opinion, *ante*, at 398–400, the Court points out that the higher rates charged to DSIs provide a subsidy for certain consumers served by investor-owned utilities, implying, I suppose, that it makes good sense to sell the DSIs more power than they received under the 1975 contracts. If Congress had wanted the Administrator to exploit the DSI market by increasing the amount of such sales, it should not have limited their share of the available supply to an "amount of power equivalent to that to which" DSIs were entitled under the 1975 contracts. And in fact the rate analysis submitted by BPA indicated that it would supply power to DSIs at the same levels as it did under the 1975 contracts. See n. 2, *supra*. Rather, the fact that the Administrator charged higher rates to DSIs after the 1980 Act became effective is significant only because it explains why § 5(d)(1)(B) did not simply provide that the new contracts would contain precisely the same terms and conditions as the 1975 contracts. Under the new contracts the DSIs' entitlement to power was to be the same as under the old contracts, but the DSIs had to pay a higher price for it.