The WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION (WUTC), Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION; Bonneville Power Administration, Respondents,

Public Power Council; Direct Service Industrial Customers (Aluminum Co. of America, Atochem North America, Columbia Falls Aluminum Company, Georgia–Pacific Corp., Kaiser Aluminum & Chemical Corp., Intalco Aluminum Corp., et al.), Respondents–Intervenors.

PUGET SOUND POWER & LIGHT COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION; Bonneville Power Administration, Respondents,

Direct Service Industrial Customers (Aluminum Co. of America, Atochem North America, Columbia Falls Aluminum Company, Georgia–Pacific Corp., Kaiser Aluminum & Chemical Corp., Intalco Aluminum Corp., et al.), Respondents–Intervenors.

Nos. 91–70619, 91–70628.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 15, 1993.

Decided June 7, 1994.

Robert D. Cedarbaum, Asst. Atty. Gen., Paul Curl, Kenneth L. Elgin, Olympia, WA, Sherilyn Peterson, Perkins Coie, Bellevue, WA, for petitioners.

Joel M. Cockrell, Washington, DC, Thomas C. Lee, Asst. U.S. Atty., Geoffrey M. Kronick, Randy A. Roach, Portland, OR for respondents.

Shelly Richardson, Portland, OR, Judith A. Bearzi, Gordon, Thomas, Honeywell, Malanca, Seattle, WA, Eric Todderud, Paul M. Murphy, Michael J. Uda, Heller, Ehrman, White & McAuliffe, Portland, OR, for respondents-intervenors.

Before: CANBY, WIGGINS, and T.G. NELSON, Circuit Judges.

Opinion by Judge CANBY.

CANBY, Circuit Judge:

## BACKGROUND

### THE RESIDENTIAL EXCHANGE PROGRAM

This case presents a challenge to certain cost calculations made by the Bonneville Power Administration ("BPA") in its operation of the Residential Exchange Program of the Pacific Northwest Electric Power Planning Conservation Act ("Northwest Power Act"), 16 U.S.C. §§ 839–839h (1985). BPA is the marketing agent for electric power produced by federal generating plants in the Pacific Northwest. The Northwest Power Act established a power exchange program between BPA and qualified investor owned utilities ("IOUs") of the Pacific Northwest. The exchange program is designed to eliminate the disparities between electric rates paid by residential customers of IOUs and

the lower rates paid by customers of publicly-owned utilities. An IOU participating in the program may sell electricity to BPA at a rate that reflects the utility's "average system cost" ("ASC") and in exchange purchase an equivalent amount of power at BPA's lower preferred rate. In actuality, no power is exchanged. Instead, BPA pays the utility the difference between the cost of the utility's power and the cost of BPA power. In effect, the Residential Exchange Program alleviates rate disparities by making BPA customers pay a subsidy to defray the cost of power that participating IOUs sell to residential customers. Petitioner Puget Sound Power & Light Company ("Puget") takes part in this exchange program.

The Northwest Power Act delegates to BPA the task of calculating a participating utility's ASC. 16 U.S.C. § 839c(c)(7). As might be expected, the calculus that BPA uses to determine a utility's ASC is complex, encompassing a variety of factors. *See generally* Average System Cost Methodology, 18 C.F.R. § 301.1 (1991). At its simplest, the ASC equals the utility's "contract system costs" divided by its "contract system load." *Id.* § 301.1(b)(1). Contract system costs are the costs of production and transmission of electricity. The contract system load reflects the utility's total retail sales for a fixed period.

BPA has adopted a "jurisdictional" approach to determining the ASCs of participating IOUs, relying on the state utility regulatory commissions determination of each utility's costs. An IOU seeking an ASC determination must submit to BPA a "loss study" containing a breakdown of the utility's costs, as determined by the state commission, for obtaining and transmitting power.

**THE BEP AGREEMENT**

During the 1970's, BPA, Puget and other investors entered into an agreement to finance the construction of a nuclear power plant, WNP–3, a part of the Washington Public Power Supply System. The agreement provided that BPA would oversee the construction and would take a seventy percent interest in the plant. Puget would receive a five percent interest. When the plant was two-thirds complete, BPA deferred construction indefinitely. Puget and the other investors sued BPA and eventually reached a settlement. The settlement requires BPA to supply Puget, for thirty years, the amount of electric power ("Bonneville Exchange Power" or "BEP") equivalent to that quantity Puget would have received had the WNP–3 plant been completed, reduced to account for the fact that Puget had been relieved of the obligation to pay the unpaid portion of its anticipated capital investment. The agreement also requires Puget to pay BPA's surrogate operating and maintenance costs, that is, the amount Puget would have had to contribute for WNP–3's upkeep had the plant been completed.

How Puget's investment in WNP–3 figures into Puget's average system costs, for the purposes of its participation in the Residential Exchange Program, was deliberately left undetermined in the settlement agreement and is the core issue in this appeal.

**THE WUTC DECISION**

The Washington Utilities and Transportation Commission ("WUTC") is the regulatory body charged with setting retail electric rates in the State of Washington. As part of the rate-setting process, the WUTC examines a utility's costs to decide which may be passed on to the consumer and on which of its investments the utility may earn a return. Costs that the WUTC determines were incurred imprudently are not figured into a utility's retail rate.

Puget requested a rate increase to cover the funds Puget had invested in the WNP–3 project. The WUTC concluded that the entire expenditure, approximately $147 million, had been prudent and therefore permitted Puget to recover the investment in its retail rates. However, the WUTC decided that Puget should be allowed to earn a return only on the part of its investment that represented avoided costs, that is, the price Puget would have had to pay to acquire from some other source the quantity of power equivalent to the BEP it receives pursuant to the settlement agreement. The WUTC found that the avoided costs amounted to $95 million. Puget could recover the remaining $52 million through consumer rates, the WUTC ruled,

but was not entitled to earn a return on that portion of the WNP–3 investment. The WUTC noted, "This approach will be consistent with our prior decisions regarding extraordinary expenses and provides a fair sharing of responsibility between stockholders and rate payers."

## THE ASC DETERMINATIONS

Puget has submitted three ASC rate filings with the BPA since the WUTC's rate decision. In each of the filings, Puget listed among its production costs $147 million for the BEP. In each case, BPA excluded the $52 million portion from the calculation of Puget's ASC.

Puget filed for FERC review of each of the three determinations, contesting BPA's decision to disallow the $52 million. The WUTC asked FERC to convene a joint state board to assist FERC in the review, as specified in the Northwest Power Act. 16 U.S.C. § 839f(g). After consolidating the three cases, FERC issued an order accepting BPA's conclusions and rejecting the WUTC's request for a joint state board.

## ISSUES ON APPEAL

This case presents several novel issues related to the administration of the Residential Exchange Program. Foremost is the question whether BPA acted improperly in excluding from Puget's ASC calculation that portion of Puget's investment in the WNP–3 project that the WUTC determined did not represent avoided costs. In addition, the petitioners challenge FERC's refusal to convene a joint state board to review BPA's ASC determination. Before reaching that issue, however, we must determine whether we have jurisdiction to review FERC's decision. Finally, the intervenors in this case, direct customers of BPA, have sought to attack other aspects of the BPA order and we discuss our reasons for refusing to entertain their claims.

## DISCUSSION

### I. THE BPA'S DECISION TO EXCLUDE THE $52 MILLION FROM PUGET'S ASC CALCULATION

■■■ The scope of our review of BPA's ASC determination is governed by the Administrative Procedure Act, 5 U.S.C. § 706 (1977). 16 U.S.C. § 839f(e)(1)(B); *CP Nat'l Corp. v. BPA*, 928 F.2d 905, 912–13 (9th Cir.1991). We generally accord substantial deference to an agency's interpretation of the statute that it administers. *PacifiCorp v. Federal Energy Regulatory Comm'n*, 795 F.2d 816, 820 (9th Cir.1986). Principles of administrative deference "have particular force" in the context of a review of BPA's interpretation of the Northwest Power Act: "The subject under regulation is technical and complex. BPA has longstanding expertise in the area, and was intimately involved in the drafting and consideration of the statute by Congress." *Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 390, 104 S.Ct. 2472, 2479, 81 L.Ed.2d 301 (1984); *accord CP Nat'l*, 928 F.2d at 912. We review BPA's interpretation of its own regulations with a similar degree of deference. *See Sierra Pac. Power Co. v. EPA*, 647 F.2d 60, 65 (9th Cir.1981).

The Northwest Power Act charges BPA with developing a methodology, in consultation with state regulatory bodies and subject to the approval of FERC, for calculating participating IOUs' average system costs. 16 U.S.C. § 839c(c)(7). The methodology that BPA has established defines ASC as a utility's "contract system costs" divided by the "contract system load." 18 C.F.R. § 301.1. The regulations explain:

(2) *Contract system costs* means the Utility's Costs for production and transmission resources, including power purchases and conservation measures, which Costs are includable in, jurisdictionally allocated by, and subject to the provisions of Appendix 1.[1] Contract System Costs do not include Costs excluded from ASC by section 5(c)(7) of the Northwest Power Act.

---

1. Appendix 1 contains the form that an IOU must use to report its costs and other financial data. It consists of four schedules that break the IOU's costs down into various categories, including expenses, investments, long-term debt.

(3) *Contract system load* means the firm energy load used by the State Commission for the purpose of establishing retail rates, adjusted pursuant to the Average System Cost Methodology rule.

(4) *Costs* means the aggregate dollar amount or any portion of the amount allowed or relied upon by the State Commission to determine the test period revenue requirement for the Utility in a Jurisdiction.

*Id.* (b).

While no costs will be included in an IOU's contract system costs unless the state regulatory authority has figured that cost into the utility's rates, BPA retains discretion to "make an independant [sic] determination for ASC computation of (1) the appropriateness of the inclusion of Costs; (2) the reasonableness of the Costs included in Contract System Cost; and (3) the appropriateness of Contract System Loads." Bonneville Power Admin., *Methodology for Determining the Average System Cost of Resources for Electric Utilities Participating in Residential Exchange,* at 4 (June 1984). The regulations limit BPA's discretion to depart from the state regulatory commission's determination of costs, however, to situations in which the Northwest Power Act would be violated by the "wholesale incorporation of cost information reported by the IOUs." *Methodology for Sales of Electric Power to Bonneville Power Administration,* 49 F.R. 39293–02,39299 (October 5, 1985) (FERC Order No. 400).

■ BPA excluded the $52 million from the ASC calculation because it concluded that that portion of the WNP–3 investment was not used for "production and transmission resources" and therefore did not qualify as part of Puget's contract system costs. Unless this conclusion was based on an unreasonable interpretation of the methodology or was arbitrary and capricious, we must uphold the exclusion. *ALCOA,* 467 U.S. at 389, 104 S.Ct. at 2479.

According to the petitioners, BPA cannot reasonably exclude the $52 million portion from the ASC calculation because under the terms of the settlement agreement, the entire $147 million invested in the WNP–3 project was used to acquire the BEP resource. The petitioners point out that the quantity of BEP that Puget receives pursuant to the agreement is equal to the amount of power that Puget would have expected to receive from the operative WNP–3 plant, reduced to account for the costs Puget was spared as a result of BPA's decision to delay completion of the project. Had Puget invested less in the WNP–3 project, it would presumably have been entitled to proportionately less BEP.

The petitioners' view of the WNP–3 settlement agreement oversimplifies. Puget did not make a dollar-for-dollar trade of its investment in WNP–3 for BEP. Instead, in entering the settlement agreement, Puget exchanged its intangible legal rights and remedies arising from BPA's decision to mothball the WNP–3 project for a right to purchase a source of electric power. The WUTC recognized that a portion of the WNP–3 investment was lost, and not simply used to purchase power, when it concluded that the $97 million portion of the investment represented the "reasonable cost or value of the BEP resource" and that the $52 million portion "represented the WNP–3 investment that was neither used and useful nor represented in the value of the BEP resource."

The WUTC never considered whether the entire WNP–3 investment qualified as a resource cost for the purposes of Puget's ASC calculation. The Commission decided to permit Puget to recover the entire WNP–3 investment through its retail rates because the investment was "prudent"—not because the entire investment constituted a "cost for production and transmission resources." At the same time, the Commission rejected Puget's suggestion that the cost of the BEP contract amounted to the sum total of Puget's investment in the WNP–3 project. Rather, after concluding that "[t]he BEP contract is a unique resource," the WUTC assigned it a value equal to Puget's avoided costs. *WUTC v. Puget Sound Power & Light Co., Third Supplemental Order,* Docket Nos. U–89–2688–T and U–89–2955–T at 21–22 (WUTC Jan. 17, 1990).

In calculating Puget's ASC, therefore, BPA was forced to venture into unchartered waters, for the agency was faced with the necessity of assessing what part of Puget's consideration for the WNP–3 settlement agreement constituted Puget's cost for the BEP. Clearly, Puget had not bought its BEP supply with the entire WNP–3 investment—the BEP contract is but one aspect of a multifaceted settlement agreement that addressed a situation involving substantial loss. BPA resolved the problem by assigning the BEP contract a value equal to Puget's avoided costs, that is, the amount that, according to the WUTC, represented the "used and useful portion" of Puget's investment. BPA's decision to exclude the $52 million portion was not unreasonable. That portion of Puget's investment in the WNP–3 project was not part of Puget's cost for the BEP contract and thus did not constitute "a cost for the production or transmission of power."

## II. FERC'S REFUSAL TO CONVENE A JOINT STATE BOARD

■ The petitioners maintain that FERC violated the Northwest Power Act when it refused to convene a joint state board to review BPA's determination of Puget's ASC.[2] Before we can address the merits of this argument, we must inquire into the source of our jurisdiction over this matter.

The Northwest Power Act provides:

Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator ... or the implementation of such final actions ... shall be filed in the United States Court of Appeals for the region.... Suits challenging any other actions under this

chapter shall be filed in the appropriate court.

16 U.S.C. § 839f(e)(5). While the Act clearly gives us jurisdiction to review BPA's ASC determinations, *id.* § 839f(e)(1)(B), it says nothing about our jurisdiction to review FERC's decisions confirming or rejecting BPA rate determinations or refusing to convene a joint state board in accordance with section 839f(g). Thus, under the Northwest Power Act, "judicial review is of the BPA action—the rate determination—and not FERC's subsequent approval and confirmation of the BPA determination." *CP Nat'l,* 928 F.2d at 911.

Petitions for review under the Northwest Power Act are timely if filed within 90 days after the BPA's action or decision becomes final. In this case, the BPA's action became final when FERC denied rehearing of its decision approving and confirming the BPA's ruling. *PacifiCorp,* 795 F.2d at 820. The petitions in this case were filed eighty-three days thereafter, and are accordingly timely under the Northwest Power Act.[3] As we have just said, however, review under that statute is confined to the order of the BPA; it does not include review of the actions of FERC.

■ We do have jurisdiction, however, to review decisions of FERC under the Federal Power Act. 16 U.S.C. § 825l(b) (1985). The petitioners' challenge to FERC's action in failing to convene a state board undoubtedly falls within that jurisdiction. There is an insurmountable problem facing petitioners, however; a petition for review under the Federal Power Act must be filed within 60 days after the FERC decision denying rehearing. Because these petitions were filed eighty-three days after FERC's order denying rehearing, they are untimely. We there-

---

**2.** Section 839f(g) of the Northwest Power Act provides:

When reviewing rates for the sale of power to the Administrator by an investor-owned utility customer [under the Residential Exchange Program], the Federal Energy Regulatory Commission shall, in accordance with the section 824h of this title—

(1) convene a joint State board, and

(2) invest such board with such duties and authorities as will assist the Commission in its review of such rates.

**3.** The intervenors contend that the petitions in this case are insufficient to invoke our jurisdiction to review the BPA's action under the Northwest Power Act, because the petitions state that they seek review of FERC's orders. We reject the contention. The petitioners clearly sought review of the ASC determination, and the failure to specify the BPA's order in the petition is not fatal. *See CP Nat'l,* 928 F.2d at 911 (failure to name BPA as a party is not fatal to petition for review of BPA order; court adds BPA as a party *sua sponte*).

fore lack jurisdiction to entertain petitioners' challenge to the actions of FERC.

We recognize that the division of our appellate jurisdiction between the Northwest Power Act and the Federal Power Act is not a very tidy one. We have no authority, however, to rewrite the statutes establishing our jurisdiction. Until such time as Congress may choose to modify the scheme, parties must adhere to the existing statutes: they may challenge orders of BPA within 90 days after they have become final (which may occur by FERC review), but if they wish to challenge actions of FERC itself, they must petition within 60 days of FERC's denial of rehearing.

Our jurisdictional ruling does not constitute an unfair surprise for petitioners. The joint board provision originates in the Federal Power Act. 16 U.S.C. § 824h. The Northwest Power Act, in directing FERC to convene a state board, specifies that it shall be done "in accordance with section 824h [of the Federal Power Act]." 16 U.S.C. § 839f(g). These provisions clearly point to the Federal Power Act, and nothing in them implies that FERC's failure to convene a state board would be reviewable under the Northwest Power Act. The plain words of the Northwest Power Act, section 839f(e)(5), fail to authorize review of FERC's actions, and the plain words of the Federal Power Act, section 825*l*, do authorize review. Petitioners were on sufficient notice that they must comply with the Federal Power Act's 60-day time limit if they wished to contest FERC's actions.

## III. INTERVENORS' ATTACK ON OTHER PARTS OF THE BPA ORDER

■ The intervenors appeared in the proceedings before BPA and in the initial FERC proceeding, but they did not seek rehearing of FERC's order confirming BPA's rate decision or petition this court for review of the ASC decision. After the time for filing petitions for review of FERC's decision had expired, we granted the intervenors leave to intervene on behalf of the respondents. In their brief, however, the intervenors went far beyond merely supporting the respondents' position; they challenged BPA's decision to

include in the ASC calculation the $97 million portion of Puget's WNP-3 investment. The petitioners and FERC moved to strike the portions of the intervenors' brief unrelated to the issues the petitioners raised in their appeal. We granted the motion and pause here to explain why.

On the surface, our decision to grant the motion to strike appears to be the obvious choice. Federal Rule of Appellate Procedure 15(a) states that review of an agency order shall be obtained by filing a petition within the time authorized by law. The intervenors neither filed a petition for review within the time authorized by law nor preserved the issue for appeal by asking FERC to reconsider its order. Orderly procedure would seem to dictate that we refuse to entertain the intervenors' issues. See *Platte River Whooping Crane Trust v. Federal Energy Regulatory Comm'n,* 962 F.2d 27, 36 (D.C.Cir.1992).

BPA, however, would have us allow the intervenors to challenge the additional part of BPA's order. The agency points out that a BPA order is a multifaceted thing, pleasing and displeasing to many concerned parties. A party that was satisfied with an order as issued might easily become dissatisfied should some other party succeed, on review, in having some part of the order modified. As a consequence, if no extra time for cross-appeals is allowed, parties may feel called upon to file protective petitions for review in order to guard against the possibility that others will seek and obtain review. And once a party has filed a protective petition, certain laws of motion take over: the petition is prosecuted rather than abandoned even though no other party has sought review.

According to BPA, to prevent this proliferation from happening we should adopt a rule along the lines of Federal Rule of Appellate Procedure 4(a)(3), which permits additional time for parties in civil cases in the district courts to file cross-appeals once the first party has filed an appeal. Recognizing that Rule 15 does not contain language permitting such a device, BPA would have us hold that, as a *jurisdictional* matter, a petition for review of one aspect of a BPA order opens the entire order up for review. This ruling

942

would permit the intervenors to challenge parts of the BPA order of which Puget and WUTC did not seek review in their petition.

While BPA's suggestion has some attraction, we have declined to accept it. We believe we are constrained by the unambiguous dictates of Rule 15. The amendment to the procedural rules that BPA has urged us to adopt—with its attendant provisions for notice to the court and other parties, the timing of filings, the scheduling of prebriefing conferences—is best addressed by Congress or by the Supreme Court in the exercise of its rule-making powers under 28 U.S.C. § 2072, and not by us.

We AFFIRM Bonneville Power Administration's determination of petitioner Puget's average system cost.

AFFIRMED.

