ATLANTIC RICHFIELD COMPANY; Aluminum Company of America; the Carborundum Company; Georgia-Pacific Corporation; Intalco Aluminum Corporation; Kaiser Aluminum & Chemical Corporation; Martin Marietta Corporation and Commonwealth Aluminum Corporation; Oregon Metallurgical Corporation; Pacific Carbide & Alloys Co.; Pennwalt Corporation; and Reynolds Metals Company, Petitioners,

and

Hanna Nickel Smelting Co., Intervenor,

v.

BONNEVILLE POWER ADMINISTRATION, and James J. Jura,* as Administrator of the Bonneville Power Administration, Respondents,

and

Northwest Investor-Owned Utilities, et al., Intervenors.

Nos. 83–7971, 83–7981, 85–7473, 85–7488.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 4, 1985.

Decided June 3, 1987.

As Amended July 27, 1987.

---

* Substituted for Peter Johnson, pursuant to Fed. R.App.P. 43(c)(1).

Paul M. Murphy, Portland, Or., Robert T. Tall, III, New York City, David N. Furman, Portland, Or., for petitioners.

Thomas C. Lee, Portland, Or., John Cameron, Randall Roach, Portland, Or., for respondents.

Before KENNEDY and REINHARDT, Circuit Judges, and PRICE,** District Judge.

PER CURIAM:

In these consolidated appeals, the district service industrial customers (DSIs) of the Bonneville Power Administration (BPA) petition for review of BPA's imposition of a "customer charge" as part of its 1983 rate-making activity.

Petitions numbered 83–7971 and 83–7981 were filed after BPA first established the rates in question but before the Federal Energy Regulatory Commission (FERC) approved the rates; petitions numbered 85–7473 and 85–7488 were filed after FERC's approval. The DSIs allege that the customer charge:

(1) constitutes a breach of their contracts with BPA and also thereby violates the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839–839h (1985) (the Regional Act);

** The Honorable Edward Dean Price, United States District Judge for the Eastern District of California, sitting by designation.

(2) violates the Regional Act because it is an impermissible charge under 16 U.S.C. § 839e(a)(1); and

(3) is an arbitrary and capricious agency action that violates the Regional Act, 16 U.S.C. § 839f(e)(2), and the Administrative Procedure Act, 5 U.S.C. § 706 (1977).

BPA is the federally-created agency that markets federal hydroelectric power in the Northwest. Its operations are governed by the Regional Act. Congress intended BPA to be a self-financing entity. The Regional Act requires BPA to establish rates that cover the costs of producing the power it sells, repay the federal investment in the Federal Columbia River Power System over a reasonable period of years, and pay for certain other expenses incurred by BPA. *Id.* § 839e(a)(1). The Regional Act prescribes the procedures to be employed by BPA for setting and modifying rates. *Id.* § 839e; *see California Energy Resources Comm'n v. BPA*, 754 F.2d 1470, 1471 (9th Cir.1985).

Most of BPA's customers are either publicly-owned utilities or investor-owned utilities who buy power from BPA and distribute it to the ultimate consumer. The petitioners here represent the only exception to this scheme. They are consumers who buy power directly from BPA and, for the most part, are industrial users who have heavy demands for electrical energy.

The history of the power distribution scheme developed by Congress in the Regional Act is discussed in *Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 382–83, 104 S.Ct. 2472, 2475–76, 81 L.Ed.2d 301 (1984) (*Alcoa*):

> Since enactment of the Bonneville Project Act of 1937, 50 Stat. 731, 16 U.S.C. § 832 *et seq.* (Project Act), the Bonneville Power Administration (BPA) has marketed low-cost hydroelectric power generated by a series of dams along the Columbia River. Although § 4(a) of the Project Act, 16 U.S.C. § 832c(a), directs the BPA administrator to "give

preference and priority to public bodies and cooperatives" when selling its power, BPA for many years enjoyed a surplus of power that allowed it to satisfy the needs of all customers in the region. As demand for power increased to exceed BPA's generating capability, however, the allocation of low-cost federal power became an issue of significant area concern. In 1980, Congress moved to avert what appeared to be an emerging customer struggle for BPA power by enacting the Pacific Northwest Electric Power Planning and Conservation Act, 94 Stat. 2697, 16 U.S.C. § 839 *et seq.* (Regional Act). That Act required BPA to offer new contracts to its several customers.

Pursuant to the statutory directive, on August 27, 1981, BPA offered a new 20–year power sales contract and an accompanying letter agreement noted as "Reference One" to each DSI. The petitioners here promptly executed both the contract and the letter agreement.

Both the contract and the letter agreement provided for curtailment charges, i.e. charges in the event the DSI does not actually purchase the amount of energy that it is forecasted to purchase. Indeed, the letter agreement was designed to modify the curtailment surcharge provisions of the contract itself.[1]

The Regional Act, in addition to requiring BPA to set rates so as to cover the costs associated with supplying power to DSIs, permits BPA to impose a subsidy charge on DSIs:

> *Rates applicable to direct service industrial customers.* (1) The rate or rates applicable to direct service industrial customers shall be established—
>
> (A) for the period prior to July 1, 1985, at a level which the Administrator estimates will be sufficient to recover the cost of resources the Administrator determines are required to serve such customers' load and the net costs incurred by the Administrator pursuant to section 839c(c) of this title, based upon the Ad-

---

1. The DSIs challenged the legality of the letter agreement in 1982. The parties compromised their differences; the DSIs paid BPA $10,000,-

000 in exchange for a waiver of the surcharge provision contained in the letter agreement.

ministrator's projected ability to make power available to such customers pursuant to their contracts, to the extent that such costs are not recovered through rates applicable to other customers; and

(B) for the period beginning July 1, 1985, at a level which the Administrator determines to be equitable in relation to the retail rates charged by the public body and cooperative customers to their industrial consumers in the region.

16 U.S.C. § 839e(c). The net costs incurred pursuant to section 839c(c) referred to above are the costs associated with BPA's residential exchange program, which offers subsidized rates to residential users and small farmers. The practical effect of these provisions was that at least until July 1, 1985, BPA could impose on the DSIs most of the cost burdens of the residential exchange program.

In 1983 BPA conducted ratemaking proceedings in which the DSIs were allowed to present evidence. During the ratemaking proceedings, BPA determined that DSI revenues would not recover BPA's costs. BPA proposed a rate for the DSIs which consisted of three components:

(1) an energy charge based on the amount of electric energy that a DSI actually uses;

(2) a demand charge based on the total amount of electric capacity that a DSI actually reserves;[2] and

(3) a customer charge based on a DSI's forecasted operating demand.

The customer charge differs from the other two charges in that it is a fixed charge that bears no relation to the actual amounts of energy used or capacity reserved by a DSI. The customer charge insures BPA a certain level of revenue from a DSI even if no power is actually used or demanded. The rate established by BPA is $7.34 per kilowatt of 89.4 percent of the forecasted operating demand, which BPA sets for each DSI customer.

The 1983 rates established by BPA were contained in its 1983 rate decision dated September 29, 1983. The rate decision was submitted to FERC on October 3, 1983. In addition to final confirmation and approval, BPA sought interim FERC approval and waiver of the 90-day advance filing requirement. On October 26, 1983, FERC granted the waiver and interim approval. FERC determined that the rates could be implemented for a period of one year effective November 1, 1983, subject to a refund with interest upon FERC disapproval. The DSIs filed petitions for review in this court on December 23, 1983, numbers 83-7971 and 83-7981.

On July 2, 1985, FERC issued an order confirming and approving BPA's rates. On September 4, 1985, both petitioners filed petitions for review of the FERC order, numbers 85-7473 and 85-7488. On September 25, 1985, this court consolidated all four petitions for hearing; we also ordered that they be calendared for argument with the consolidated actions in *City of Seattle v. Johnson*, 813 F.2d 1364 (9th Cir.1987).

The first issue that this court must resolve is its jurisdiction to consider the 1983 petitions. Section 839f(e)(1) of 16 U.S.C. provides in pertinent part as follows:

> For purposes of Section 701 through 706 of Title 5 of the United States Code, the following actions shall be final actions subject to judicial review....
>
> (G) Final rate determinations under Section 839e of this title.

Section 839f(e)(4)(D) of 16 U.S.C. provides that "rate determinations pursuant to section 839e of this title shall be deemed final upon confirmation and approval by the Federal Energy Regulatory Commission."

---

**2.** In electrical ratemaking parlance, "energy" is the total amount of electricity supplied over a given period of time (measured in kilowatt-hours). "Capacity" is the maximum energy that the electric generating system may provide at any given moment (measured in kilowatts). In servicing its customers, BPA must provide enough energy to meet a customer's requirements during the period and must also have the available capacity to meet the customer's peak demand for electricity at any given moment during that period. *See Central Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101, 1121 (9th Cir.1985) (*Central Lincoln II*).

This court has been conferred jurisdiction to review only final actions of BPA. *Id.* § 839f(e)(5). Petitions for review must be filed within 90 days after the final action being challenged. *Id.*

■ As noted above, FERC approved and confirmed the 1983 rates on July 2, 1985; therefore, both of the 1983 actions attacking the rates were filed before the rates under attack became final. Petitioners attack the rates as established by BPA; they do not purport to seek a review of FERC's confirmation. Petitioners seek to invoke our jurisdiction as to the 1983 petitions by their contention that the "customer charge" is not a "rate" as contemplated by the Regional Act; rather they assert that it is a charge for refusing power that violates their contracts with BPA. The customer charge is a rate for the sale or disposition of power that is established by BPA and is subject to FERC review; this court is without jurisdiction to hear the 1983 petitions because they do not involve a final action. *City of Seattle v. Johnson, supra,* 813 F.2d at 1367.

■ We now turn to the 1985 petitions. As a threshold matter, we do not believe that the claims raised concerning the 1985 petitions have been mooted by the discontinuance of the customer charge. The 1985 petitions seek repayment of allegedly unlawful charges imposed by the 1983 rates. If successful, the petitioners can receive a refund in the amount of the overpayments. Thus, there is a live controversy.

■ On the merits of the 1985 petitions, however, we reject petitioners' arguments. Petitioners challenge the validity of the rates under 16 U.S.C. §§ 839c(a), 839e(a)(1). The customer charges, however, are rates designed to recoup the BPA's costs associated with having to stand by ready to deliver power. *City of Seattle v. Johnson, supra,* 813 F.2d at 1367. The customer charges are simply rates based on the DSIs' potential use of power, and the fact that they are charged whether or not the DSIs use any power does not change this. BPA has provided the DSIs with a valuable service, i.e. standing by to serve them with power on demand. BPA has opted to charge the DSIs a rate for this service which is based on its costs.

We think that the rate schedule as reviewed by FERC was supported by substantial evidence. The rate was based on reasonable extrapolations from the historical data on the DSIs' operating demands. We therefore affirm the rate decision.

■ The DSIs also challenge the customer charges as a breach of contract. *See* 16 U.S.C. § 839f(e)(1)(B). Specifically, the DSIs contend that the customer charges were in substance a curtailment charge, forbidden by their agreement with BPA. We disagree. A curtailment charge is a charge imposed for curtailing one's demand for power below a certain level. A customer charge, however, does not operate in this way. The customer charge, as discussed above, is a rate charged by BPA for the service of standing by with power on demand. The customer charge is the same whether a DSI has a high or low demand for power. We thus reject the breach of contract challenge to the customer charge.

Finally, we reject petitioners' claim that the decision to impose the customer charge was arbitrary and capricious within the meaning of 16 U.S.C. § 839f(e)(2) or 5 U.S.C. § 706(2)(A). The decision to impose a customer charge was a reasonable decision in light of economic realities, and does not amount to an arbitrary or capricious decision.

Petitions 83–7971 and 83–7981 are DISMISSED for lack of jurisdiction; petitions 85–7473 and 85–7488 are DENIED on the merits.