CP NATIONAL CORPORATION, a California corporation; the Montana Power Co., a Montana corporation; Pacific Power & Light Co., a Maine corporation; Portland General Electric Co., an Oregon corporation; Puget Sound Power & Light Co., a Washington corporation; and the Washington Water Power Co., a Washington corporation, Petitioners,

v.

James JURA, Administrator of the Bonneville Power Administration, Department of Energy; and the Federal Energy Regulatory Commission, Respondents,

and

Direct Service Industrial Customers, Intervenors.

PUBLIC GENERATING POOL, Petitioner,

v.

James JURA, as Administrator of the Bonneville Power Administration, Department of Energy; John Herrington, as Secretary of the Department of Energy, Respondents,

and

Direct Services Industrial Customers, Intervenors.

Nos. 85–7536, 85–7542.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1988.

Decided May 25, 1989.

John Daniel Ballbach, Perkins Coie, Seattle, Wash., for petitioner Puget Sound Power & Light Co.

Alan S. Larsen, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for petitioner Public Generating Pool.

Kurt R. Casad, Sp. Asst. U.S. Atty., Portland, Or., for respondent Bonneville Power Admin.

Paul M. Murphy, Heller, Ehrman, White & McAuliffe, Portland, Or., for intervenor Direct Services Admin.

Before SCHROEDER, ALARCON and NORRIS, Circuit Judges.

SCHROEDER, Circuit Judge:

This is a petition to review rate schedules enacted by the Bonneville Power Administration in 1983. Petitioner Puget Sound Power and Light Company is an investor-owned utility serving retail customers in Washington, and petitioner Public Generating Pool is a group of nine publicly-owned utilities serving customers in Washington and Oregon. In this proceeding they challenge the "availability charge" contained in the 1983 Priority Firm Power Rate Schedule ("PF–83") for publicly-owned utilities, and the 1983 New Resources Firm Power Rate Schedule ("NR–83") for investor-owned utilities. This "availability charge" has the effect of requiring petitioners to pay rates based on how much power they are empowered to purchase from the BPA under their power sales contracts, not solely on the actual amount of power purchased. Petitioners ask us to invalidate this rate mechanism because petitioners claim that it conflicts with the provisions of their contracts with the BPA for the purchase of power.

This matter has had a complex procedural history which will be explained more fully below. Most recently, petitioners moved to transfer this matter to the Claims Court, so we must deal with a threshold jurisdictional issue before reaching plaintiffs' challenge to the validity of the rate provisions. We conclude that under the Pacific Northwest Electric Power Planning and Conservation Act, as recently interpreted by this court in *Public Utility Dist. No. 1 of Clark County v. Johnson*, 855 F.2d 647, 650 (9th Cir.1988), this court, rather than the Claims Court, has jurisdiction to review this rate determination. 16 U.S.C. § 839f(e)(1)(G) (1982). We further

hold on the merits that petitioners have not shown any basis for invalidating the availability charge.

*Procedural Background and Jurisdiction.*

These claims were originally brought before this court in *City of Seattle v. Johnson* and *Puget Sound Power and Light Co. v. Johnson* (the *"City of Seattle Cases"*). Those cases were dismissed for lack of jurisdiction because the 1983 rates challenged had not yet been approved by the Federal Energy Regulatory Commission and were thus not yet final. *City of Seattle v. Johnson,* 813 F.2d 1364, 1368 (9th Cir.1987). On July 2, 1985, FERC confirmed and approved the 1983 BPA rates. 32 FERC ¶ 61,014 (1985). Petitioners timely filed their petition for review in this court pursuant to 16 U.S.C. § 839f(e)(5) within 90 days of final FERC approval.

In a motion filed with this court September 19, 1988, petitioners sought to transfer the action to the U.S. Claims Court pursuant to 28 U.S.C. § 1631 (1982). Petitioners argue that this court's decision in *Public Utility Dist. No. 1 of Clark County v. Johnson,* 855 F.2d 647 (9th Cir.1988), signifies that the U.S. Claims Court is the exclusive forum for their claims, because petitioners now choose to characterize their claims as sounding in contract. They assert that the availability charges included in the 1983 rates constitute a "breach" of petitioners' power sales contracts with BPA.

Despite the words used to characterize petitioners' grievance, however, its focus is on the 1983 rates. Neither the Pacific Northwest Power Act nor any of our decisions interpreting it support petitioners' argument that the Claims Court has jurisdiction over an action which calls for review of ratemaking by the BPA. The Act provides that:

> Suits to challenge ... final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions ... shall be filed in the United States Court of Appeals for the region.

16 U.S.C. § 839f(e)(5) (1982). Under the Act, final rate determinations are "final actions" by the BPA, and challenges to such rate determinations must be filed in this court. 16 U.S.C. § 839f(e)(1)(G) (1982); *see also Central Lincoln Peoples' Utility Dist. v. Johnson,* 735 F.2d 1101, 1108–09 (9th Cir.1984) (*"Central Lincoln II"*). We have noted in the past that, in providing for direct review by this court, Congress intended to facilitate prompt action on challenges to BPA's decisions. *See Public Power Council v. Johnson,* 674 F.2d 791, 795 (9th Cir.1982).

A party's characterization of its claim as one for breach of contract is not dispositive of jurisdictional issues. In *Pacific Power and Light Co. v. Bonneville Power Administration,* 795 F.2d 810, 816 (9th Cir. 1986), we stated that in enacting section 839f(e)(5), Congress has decided that jurisdiction under the Act should be a "function of the agency whose actions are being challenged rather than a function of the cause of action which petitioner asserts." In *City of Seattle v. Johnson,* 813 F.2d 1364, 1368 (9th Cir.1987), we said with respect to this very dispute that challenges to the rate changes were not ripe for review by this court until final approval by FERC, irrespective of the fact that the challenge was characterized as a breach of contract claim. We have consistently exercised jurisdiction where the action being challenged is in reality final ratemaking pursuant to BPA's statutory authority, regardless of the petitioner's characterization of its claim. *See Atlantic Richfield Co. v. Bonneville Power Administration,* 818 F.2d 701, 705 (9th Cir.1987) (reviewing claim that customer charge imposed in 1983 rates constituted a breach of contract); *Pacificorp v. FERC,* 795 F.2d 816, 818–20 (9th Cir.1986) (court of appeals had jurisdiction to review BPA's revision of cost methodology, although claim was characterized as one for breach of contract).

Our recent decision in *Public Utility Dist. No. 1,* upon which petitioners rely, is not to the contrary. Its reasoning actually lends support to our exercise of jurisdiction here. In *Public Utility Dist. No. 1,* a

public utility challenged not an aspect of a rate, but BPA's refusal to purchase one of the utility's power resources. *Public Utility Dist. No. 1*, 855 F.2d at 648. The utility alleged the existence of an oral or implied-in-fact contract in which the BPA agreed to purchase the power source. *Id.* This court held that it had no jurisdiction over the utility's contract claims. We expressly distinguished that case from the Seattle cases, involving this dispute, because the claim in *Public Utility Dist. No. 1* was based upon alleged acts unrelated to any rate proceeding. *Public Utility Dist. No. 1*, 855 F.2d at 650. We noted that "the principal conduct of the agency on which petitioner's claim is based is not final action taken pursuant to statutory authority," but "alleged contractual commitments made outside the scope of any administrative record, and which petitioners contend have been breached." *Id.*

Here, as in *Pacific Power and Light Co.*, this court has exclusive jurisdiction over what is in reality a challenge to a final action of the BPA taken pursuant to statutory authority. 16 U.S.C. § 839f(e)(1)(G) (1982). A party wishing to challenge the BPA's ratemaking activity as violating contractual provisions or on any other grounds should raise that challenge in the ratemaking proceedings, giving the BPA the opportunity to adjust its rates if necessary. This enables the BPA to adjust and balance the conflicting needs of many different customers in the ratemaking procedure. Under the Pacific Northwest Power Act and the Bonneville Project Act the BPA is required to recover its costs of generating power through its rates. The Pacific Northwest Power Act provides that:

> ... rates for the sale and disposition of electric energy and capacity ... shall be established and, as appropriate, revised to recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the federal investment in the Federal Columbia River Power System.... over a reasonable period of years and the other costs and expenses incurred by the administrator pur-

suant to this chapter and other provisions of law.

16 U.S.C. § 839e(a)(1). *See also* Bonneville Project Act of 1937, 16 U.S.C. § 832f (1982) ("[r]ate schedules shall be drawn having regard to the recovery ... of the costs of producing and transmitting such electric energy....").

Congress has given this court exclusive jurisdiction for judicial review of that rate-making function and we must exercise that jurisdiction over challenges to BPA's rates. Our jurisdiction is invoked by the filing of a petition to review the agency's final action. 16 U.S.C. § 839f(e)(1)(G) (1982); *Pacific Power and Light Co. v. Bonneville Power Administration*, 795 F.2d 810, 816 (9th Cir.1986); *see also* Ninth Circuit Rules 15–2.1, –2.2 (procedures for obtaining review under the Pacific Northwest Electric Power Planning and Conservation Act). This is such a challenge to rates and this court, not the Claims Court, has exclusive jurisdiction to consider it.

### Validity of the Availability Charge

■ Petitioners' position on the merits, as it was during the ratemaking process, is that the availability charge in the 1983 rate schedule is inconsistent with the power sales contracts petitioners have entered into with the BPA. The BPA administrator rejected that position during the ratemaking proceeding. Administrator's Record of Decision, 1983 Final Rate Proposal, WP–83–A–02, p. 197–202 (Dept. of Energy, Sept.1983).

Some understanding of the nature of the contracts is helpful to our resolution of petitioner's challenges. Under the Bonneville Project Act, the BPA administrator is authorized to negotiate and enter into power sales contracts for up to 20–year periods. Bonneville Project Act, 16 U.S.C. § 832d(a) (1982). The statute provides that the contracts are "[s]ubject to the provisions of [the Bonneville Project Act] and to such rate schedules as the Secretary of Energy may approve...." The statute specifies that "contracts entered into under this subsection shall contain ... such provisions as the administrator and purchaser

agree upon for the equitable adjustment of rates at appropriate intervals, not less frequently than once in every five years...." *Id.* The Act also provides that the power sales contracts "shall be binding in accordance with their terms." *Id.*

The Pacific Northwest Power Act required the BPA Administrator to begin negotiations for initial long-term contracts with the then-existing customers of BPA within nine months of the passage of the Act. Pacific Northwest Power Act, 16 U.S.C. § 839c(g) (1982). In accordance with this mandate BPA published notice in the Federal Register of the procedure for negotiating the new contracts on March 24, 1981. 46 Fed.Reg. 18,331 (1981). The BPA held public hearings to receive comment on the proposed contracts, 46 Fed.Reg. 23,287 (1981), and published a notice in the Federal Register of the availability of draft prototype power sales contracts on June 12, 1981. 46 Fed.Reg. 31,238 (1981). Following further negotiations and additional public hearings BPA offered the power sales contracts on August 28, 1981. 46 Fed.Reg. 44,340 (1981). The basic terms of the power sales contracts are identical within each respective customer class.

The availability charge as incorporated in the 1983 rate schedule is a weighted average of the purchaser's monthly "computed energy maximum," the amount of power that BPA is obligated to supply on demand, and the "measured energy," the amount of power BPA actually supplies. The effect of the availability charge is to charge purchasers partially on the basis of actual deliveries and partially on the basis of how much the customers are entitled to take from BPA. The purchaser thus pays a higher average rate when using lower amounts of power, and a lower average rate when using greater amounts, and is not as free to replace BPA-supplied power with power from other sources as it would be if the BPA charged rates that were uniform regardless of the actual amount of power purchased.

Petitioners point to the power sales contracts' provision requiring payments for firm power to be in accord with the rate schedule for "measured demand and measured energy." They argue that this provision obliges them to pay only for "measured energy," defined elsewhere in the contract as power that they request and schedule. They contend that the availability charge, designed to recover BPA's costs for standing ready to deliver power to purchasers whether or not the power is actually scheduled, is in conflict with the contracts.

Petitioners' obligations to pay BPA for power are controlled by section 19(b). That section provides that:

> The Purchaser shall pay Bonneville each Billing Month for all amounts described in the following paragraphs in accordance with the terms of the rate schedules specified below, the payment provisions of the General Contract Provisions Exhibit and of the Wholesale Power Rate Schedules and General Rate Schedule Provisions Exhibit.
>
> (1) For Firm Power delivered hereunder in accordance with the following:
>
> (A) If the Purchaser is a public body cooperative or Federal Agency, payment shall be at the rate specified in the Priority Firm Power Rate Schedule for the Purchaser's Measured Demand and Measured Energy. Provided, however, that, after determining the billing factors for the Firm Power delivered hereunder, the New Resources Firm Power Rate shall be substituted for the Priority Firm Power Rate Schedule for that portion of the Purchasers' billing demands, if any, identified pursuant to section 8 for service to New Large Single Loads. If the Purchaser is an investor-owned utility, payment shall be at the rate specified in the New Resources Firm Power Rate schedule for the Purchaser's Measured Demand and Measured Energy.

"Measured Energy" is defined in section 3(bb) of the power sales contract as "the sum of the measured amounts for all hours in a billing month...." "Measured Amounts" are defined in section 3(2) of the contract as "the hourly amounts of firm power requested by the purchaser ... and

scheduled to the purchaser...." Petitioners stress section 19(b)(1)(A)'s reference to "measured energy" and argue that this means that the rate for measured energy cannot vary depending on the amount used. Petitioners' argument essentially is that section 19(b)(1)(A) of the contract prevents BPA from taking into account its fixed costs for power kept in readiness, but not delivered, in setting its rates. We conclude, however, that the language upon which petitioners rely merely identifies the controlling rate schedule. It was not intended to limit BPA's discretion to formulate those rates.

While petitioners contend that the language of section 19(b)(1)(A) identifies all of the elements of petitioners' payment obligations, this interpretation ignores the language of section 19(b). That section states that purchasers will pay BPA for all amounts described "in accordance with the terms of the rate schedules specified below, the payment provisions of the General Contract Provisions Exhibit and of the Wholesale Power Rate Schedules and General Rate Schedule Provisions Exhibit." While section 19(b)(1)(A) does define the energy amounts for which petitioners should be charged, the rate chargeable for those amounts is, under the contract, specified only in the rate schedules. Those rate schedules may include billing factors, such as the availability charge, which vary the average rate per unit of power depending on the amount used. The availability charge is included in the rate schedules as a "billing factor." Section 19(b)(1)(A) itself refers to billing factors, but does not define them. Billing factors are defined only in the rate schedules.

Section 19(b)(1)(A) also refers to the Priority Firm Power Rate Schedule and New Resources Firm Power Rate Schedule for determination of "billing demand." "Billing demand," even in the rate schedules extant when the power sales contracts were negotiated and executed in 1981, provided for a "demand ratchet" which, like the availability charge in the PF–83 and NR–83 rate schedules, varied the average rate for energy depending on the amount used.

Petitioners' suggested interpretation of section 19(b) is also not consistent with section 8(i) of the General Contract Provisions. Section 8(i) creates a billing limitation based on a purchaser's entitlement to firm power, rather than on the amount used. It provides that:

Rates for firm power sold ... shall be established in such a fashion that the purchaser shall not be billed for firm power during any twelve-month rate period *in excess of the amount which the purchaser was entitled to take during such twelve-month period.* (emphasis added).

This provision clearly preserves ratemaking flexibility for the BPA to take into account amounts of power which the purchasers were "entitled to take."

The contracts contain other terms that preserve the BPA's flexibility in setting rates. Section 8 of the General Contract Provisions, "Equitable Adjustment of Rates," provides, in addition to the language of section 8(i) quoted above, that:

(8)(a) Bonneville shall establish, periodically review and revise rates for the sale and disposition of electric power, capacity or energy sold pursuant to the terms of this contract. Such rates shall be established in accordance with applicable law.

.      .      .      .      .

(8)(c) A purchaser shall pay Bonneville for the electric power and energy *made available* under this contract.... (emphasis added).

This provision also shows that the BPA retained great flexibility in setting rates, and contemplated charges for power "made available," as well as power delivered.

Petitioner's interpretation of section 19(b) is also inconsistent with administrative history. BPA described the operation of that provision when it was announced for public review and comment. In its Federal Register notice summarizing the proposed power sales contract, BPA stated, consistent with section 8(c) of the General Contract Provisions, that "computed requirements payments are not figured strictly from amounts taken, but rather by comparing amounts taken with the amount

that should have been taken, according to the computed requirements formula." 46 Fed.Reg. 31,238, 31,244 (1981).

Petitioners' argument here is analogous to the one made in *Atlantic Richfield Co. v. Bonneville Power Administration,* 818 F.2d 701 (9th Cir.1987), in which the Direct Service Industrial Customers ("DSIs") of the BPA challenged BPA's imposition of a "customer charge" as part of the 1983 rate-making activity. The DSIs argued that the customer charge, which was based on a DSI's forecasted operating demand, constituted a "curtailment charge" which penalized customers for failing to order power, and was forbidden by the customers' agreements with BPA. This court found in *Atlantic Richfield* that the customer charge was not a curtailment charge, but "a rate charged by BPA for the service of standing by with power on demand." *Id.* at 705. We upheld the challenged charge. We should reach a similar result in this case.

For these reasons, we conclude that BPA's inclusion of the "availability charge" in its PF–83 and NR–83 rate schedules is not inconsistent with BPA's power sales contracts with petitioners. We uphold the validity of the availability charge as incorporated in the 1983 rate schedules. The petition is DISMISSED.