KAISER ALUMINUM & CHEMICAL CORPORATION, Petitioner,

Public Power Council, Intervenor,

v.

**BONNEVILLE POWER ADMINISTRATION,** Respondent.

Vanalco Inc., Petitioner,

Public Power Council, Intervenor,

v.

Bonneville Power Administration, Respondent,

Avista Corporation, Respondent–Intervenor.

Alcoa Incorporated, Petitioner,

Avista Corporation; Public Power Council, Intervenors,

v.

**Bonneville Power Administration,** Respondent.

Nos. 00–70375, 00–70379, 00–70559.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 2001

Filed Aug. 16, 2001

Paul M. Murphy, Murphy & Buchal, Portland, Oregon; William H. Walters, Miller Nash, Portland, Oregon; Michael J. Uda of Doney, Crowley, Bloomquist & Uda, Helena, Montana, for the petitioners.

Thomas C. Lee, Assistant U.S. Attorney and David J. Adler, Special Assistant U.S. Attorney, District of Oregon, Portland, Oregon, for the respondent.

Paul M. Murphy, Murphy & Buchal, Portland, Oregon, for the petitioners-intervenors.

Kyle D. Sciuchetti, Portland, Oregon; Peter J. Richardson, Eagle, Idaho, for the respondent-intervenor.

Before: GOODWIN, GREENBERG,[*] and RAWLINSON, Circuit Judges.

RAWLINSON, Circuit Judge:

Petitioners Kaiser Aluminum & Chemical Corp. ("Kaiser"), ALCOA Inc. ("ALCOA") and Vanalco, Inc. ("Vanalco") seek review of final Bonneville Power Administration ("BPA") decisions denying Petitioners' requests to purchase Surplus Firm Power at the IP–96 rate. Kaiser also requests a determination that its claims be decided by arbitration pursuant to an arbitration clause in a contract between Kaiser and BPA.[1]

We have exclusive jurisdiction over the petitions pursuant to 16 U.S.C. § 839f(e)(5). The petitions are timely because they were filed within ninety days of BPA's final decision. Id. Because of our exclusive jurisdiction, Kaiser's claims are not arbitrable. BPA's decisions were reasonable and not contrary to statutes. Accordingly, we dismiss the petitions.

## BACKGROUND

Respondent Bonneville Power Administration ("BPA") is a federal agency charged by Congress with marketing the hydroelectric power generated by a series of dams along the Columbia River. See 16 U.S.C. §§ 832–832m. Petitioners Kaiser, ALCOA and Vanalco are aluminum smelters permitted by the Northwest Power Act to buy electric power directly from BPA as Direct Service Industrial customers ("DSIs"). See 16 U.S.C. §§ 839a(8), 839c(d)(4)(A), and 839c(g).

BPA is governed largely by four statutes: the Bonneville Project Act of 1937, 16 U.S.C. §§ 832–832m ("Project Act");

the Pacific Northwest Consumer Power Preference Act of 1964, 16 U.S.C. §§ 837–837h ("Preference Act"); the Pacific Northwest Federal Transmission System Act of 1974, 16 U.S.C. §§ 838–838l ("Transmission Act"); and the Pacific Northwest Electric Power Planning and Conservation Act of 1980, 16 U.S.C. §§ 839–839h ("Northwest Power Act"). In Association of Public Agency Customers ("APAC") v. Bonneville Power Administration, 126 F.3d 1158, 1164 (9th Cir.1997), we recognized that "[t]hese statutes subject BPA to a variety of detailed and potentially conflicting statutory directives." For example, the "Northwest Power Act requires BPA to set its rates for electric power at a level sufficient to meet its costs and to repay the federal debt incurred in building the projects included in the Federal Columbia River Power System." Id. (citing 16 U.S.C. §§ 838g, 839(4), 839e(a)(1)). In APAC, we noted that while such a requirement would tend to encourage higher rates, "the Transmission System Act requires that BPA market federal power 'with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles.'" Id. (quoting 16 U.S.C. § 838g). Additionally, "BPA must also be environmentally conscious, support energy conservation, and act to protect the fish and wildlife of the Columbia River basin." Id. (citing 16 U.S.C. §§ 839, 839b).

BPA's customers include federal agencies, public bodies (including public utilities), private utilities, and DSIs such as Petitioners. See Aluminum Co. of America ("ALCOA I") v. Central Lincoln Peoples' Utility Dist., 467 U.S. 380, 384 & n. 2, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984).

---

[*] The Honorable Morton I. Greenberg, Senior Judge of the United States Court of Appeals for the Third Circuit, sitting by designation.

1. Related motions are addressed in a separately filed order.

Public bodies are "preference" customers to whom BPA is required to give priority over non-preference customers. *Id.* at 384, 104 S.Ct. 2472 (citing 16 U.S.C. § 832c(b)). BPA's primary marketing area, however, is the Pacific Northwest, which includes Washington, Oregon, Idaho, the part of Montana west of the Continental Divide, and the parts of Utah, Wyoming and Nevada that are within the Columbia River drainage. *See Aluminum Co. of America ("ALCOA II") v. Bonneville Power Admin.,* 903 F.2d 585, 588 (9th Cir.1990) (citing 16 U.S.C. § 839a(14)). Under the Preference Act, BPA may sell power outside the Pacific Northwest, but only if it has surplus energy to do so.[2] *Id.* (citing 16 U.S.C. § 837a). "Surplus energy" is defined as "electric energy generated at Federal hydroelectric plants in the Pacific Northwest which would otherwise be wasted because of the lack of a market therefore in the Pacific Northwest at any established rate." 16 U.S.C. § 837(c).

In the 1970s, projections showed that due to increases in power demands, preferences to Northwest public bodies would soon require all of BPA's power. *ALCOA I,* 467 U.S. at 385, 104 S.Ct. 2472. Accordingly, in 1973, BPA announced that new contracts to private utilities would not be offered. *Id.* While BPA signed contracts with DSIs in 1975, BPA advised the DSIs that their new contracts would not likely be renewed when they expired, sometime between 1981—1991. *Id.* In order to avoid disputes over BPA's proposed power allocations, in 1980, Congress enacted the Northwest Power Act. *Id.* at 385–86, 104 S.Ct. 2472. The Northwest Power Act allowed BPA to acquire resources to increase the supply of federal power, and required BPA to enter into long term contracts providing DSIs the same amount of power to which they were entitled under the 1975 contracts. *Id.* at 386–87, 104 S.Ct. 2472 (citing Section 5(d)(1)(B) of the Northwest Power Act, 16 U.S.C. § 839c(d)(1)(B)). Pursuant to this directive, in 1981, BPA entered into 20–year contracts with the DSIs (the "1981 Contracts"). *See APAC,* 126 F.3d at 1165. The 1981 contracts allowed the DSIs to vary their power load depending upon market conditions and to terminate their contracts with one year's notice to BPA. *See id.; see also* Power Sales Contract between ALCOA and BPA executed on August 31, 1981, ¶¶ 2(a), 4–5. The 1981 contracts also required any DSI desiring to continue purchasing BPA power after the 20–year term to request a replacement contract by June 30, 1993. *See APAC,* 126 F.3d at 1166.

In the 1990s, the price of wholesale power in the Pacific Northwest began to drop and, for the first time in history, BPA faced considerable price competition. *Id.* "By the Fall of 1995, competition for the DSIs' business was fierce." *Id.* at 1176. Many DSIs were considering offers from alternative power suppliers at prices below BPA's rates. *See id.* BPA, therefore, began rate-making proceedings to create more competitive rates. *See id.* BPA responded to these competing offers by offering the DSIs Block Sales Contracts, including target rates which were later established as actual rates. *See id.* at 1168, 1176. Of the Petitioners, Kaiser was the only one to enter into a Block Sales Contract. Because Kaiser did not terminate its 1996 Block Sales Contract, Kaiser's prior [1981] contract terminated.

In a letter dated September 29, 1995, Vanalco terminated its "entire [c]ontract [d]emand effective ... March 31, 1996,"

---

**2.** BPA may also market "surplus peaking capacity" under similar restrictions outside the Pacific Northwest (*see* 16 U.S.C. § 837a). Such peaking capacity is not at issue in this case.

and decided to "buy power and services from other providers." On March 13, 1996, however, Vanalco amended its termination letter to terminate only 225.2 megawatts of its 235.2 megawatts of contract demand.

In June 1996, BPA issued its Rate Record of Decision ("1996 Rate ROD") making findings and conclusions regarding its proposed rates. BPA completed its rate-making proceedings and, effective October 1, 1996, established the IP–96 rate and the FPS–96 rate. The rates were confirmed and approved by the Federal Energy Regulatory Commision ("FERC") on July 30, 1997. *See* 80 FERC ¶ 61, 118, 1997 WL 465613 (July 30, 1997). The IP–96 rate was more or less a fixed rate which applied to DSI customers purchasing under the 1981 contract; full requirement DSI customers purchasing under the 1996 [Block Sales] contracts; and Partial requirement DSI customers purchasing under the 1996 [Block Sales] contracts. The FPS–96 rate was a more flexible rate which could react to market pressures, and was available for the purchase of Firm Power for use inside and outside the Pacific Northwest.

Prior to FERC approval, on January 7, 1997, BPA and its customers (including Petitioners) executed a Settlement Agreement (the "FPS–96 Settlement Agreement") to resolve, without litigation, disputes concerning the market-based aspects of the FPS–96 rate schedule. In the FPS–96 Settlement Agreement, BPA agreed to: (1) limit the amount of firm energy sold under the FPS–96 rate; and (2) adopt a rate cap, which provides that "BPA shall not charge more than 63 mills per kilowatt-hour for firm power ... on an annual average basis ... [which is] based on the costs of BPA's highest-cost resource." The FPS–96 Settlement Agreement also

provided that "[t]he parties shall not challenge the establishment or the confirmation and approval of the FPS–96 rate schedule in the United States Court of Appeals for the Ninth Circuit."

Effective March 31, 1997, ALCOA agreed with BPA, in a Firm Energy Sales Agreement, to forego its 1981 contract at the IP–96 rate for one year in order to purchase all of its power requirements with surplus firm energy at the FPS–96 rate. ALCOA and BPA renewed that agreement in 1998 and 1999. The 1999 version provided that "[d]uring the term of this agreement, [ALCOA] hereby waives its right to purchase power at the Addy Point of Delivery under the [1981] Power Sales Contract." The 1999 version also indicated that "[d]uring the term of this Agreement, ... the Operating Demand (as this term is defined in the [1981] Power Sales Contract) at the Addy Point of Delivery shall be deemed equal to zero." The 1999 version further provided that "[b]eginning on April 1, 2000, and continuing for the duration of the Power Sales Contract, any requested increase in Operating Demand for the Addy Point Delivery shall be upon 90–days written notice by [ALCOA], and subject to approval by [BPA]." The 1999 version expired on "June 30, 2000, unless extended."

From the date the FPS–96 rate became effective until approximately November 1999, the FPS–96 rate has been more economical than the IP–96 rate. During that time period, Vanalco did not attempt to purchase power at the IP–96 rate, other than the 10 aMW of power Vanalco retained under its 1981 contract. Vanalco, however, purchased additional power at the FPS–96 rate.[3]

---

3. Some of these contracts list Energy Services, Inc. ("ESI") as the purchasing party.

ESI is Vanalco's agent.

From March 1997, under its Firm Energy Sales Agreements, ALCOA purchased 100 percent of the energy requirements contained in its Firm Energy Sales Agreements. These purchases were made at the FPS–96 rate. Between March 19, 1996 and March 24, 2000, Kaiser purchased power at the IP–96 rate pursuant to its 1996 Block Sale Contract, and at the FPS–96 rate for all its additional agreements with BPA.

Market conditions have now changed, and the IP–96 rate is more economical than the FPS–96 rate. As a result, when BPA sent notice to all customers indicating available Surplus Firm Power on December 8, 1999, both Vanalco and Kaiser requested that Surplus Firm Power at the IP–96 rate.

Kaiser requested as much as 190 MW of "available federal energy at the IP–96 rate for the March 2000 through June 2001 period." Vanalco also requested that "power be made available at the IP–96 Rate Schedule." For the first time, Vanalco claimed a "statutory and contractual right to BPA surplus firm energy at the IP–96 rate."

Similarly, ALCOA sent BPA a letter requesting its Operating Demand under the 1981 Contract for the Addy Point of Delivery be increased to 35 MW from July 1, 2000 through June 30, 2001, and sold at the IP–96 rate. ALCOA asserted that "the established rate for deliveries of this energy to ALCOA is ... the IP–96 Industrial Firm Power Rate."

BPA, in separate letters, denied Petitioners' requests to purchase the surplus firm power at the IP–96 rate. Rather, BPA offered to sell the power at the FPS–96 rate. In its letters to ALCOA and Vanalco, BPA indicated that the "FPS–96 rate schedule was established for the sale of surplus firm power under section 5(f) of the Northwest Power Act for the period October 1, 1996 through September 30,

2006." Petitioners each rejected BPA's offer and filed petitions for review with this Court. The petitions for review were consolidated.

## ESTABLISHED RATE

Petitioners argue that the only rate established for the sale of the Surplus Firm Power is the IP–96 rate, and BPA abused its authority when it refused to sell the Surplus Firm Power at that rate. Petitioners further contend that because BPA refused to sell Petitioners the Surplus Firm Power at the IP–96 rate and evidence indicates that BPA sold power at the FPS–96 rate outside the Pacific Northwest, Petitioners were not granted their regional preference under the Preference Act. BPA maintains that the only rate established for the sale of Surplus Firm Power is the FPS–96 rate.

In *ALCOA II*, we held that BPA's determination with respect to rates must be affirmed if " 'substantial evidence in the rulemaking record' supports BPA's determination." 903 F.2d at 590 (quoting 16 U.S.C. § 839f(e)(2)). We must give great weight to BPA's reasonable interpretation of a statute it is charged with administering. *See id.* We must "affirm the agency's action unless it is arbitrary, capricious, an abuse of discretion, or in excess of statutory authority." *Id.* (citing 16 U.S.C. § 839f(e)(2)). We need not find that BPA's construction is the only reasonable one, or that we would have reached the same result, to uphold BPA's interpretation. *See ALCOA I*, 467 U.S. at 389, 104 S.Ct. 2472. Instead, we need only conclude that BPA's interpretation of the relevant provision is a reasonable one. *See id.* Courts, however, are the final authority on statutory construction, and we must reject administrative constructions which are inconsistent with statutory mandates, or which frustrate the statutory

policy Congress intended to implement. *See ALCOA II,* 903 F.2d at 590.

■ BPA takes the position that, under its 1996 Wholesale Power and Rate Schedule, the IP–96 rate is applicable to the sale of Industrial Firm Power to the DSIs under their 1981 power sales contracts or 1996 Block Sales Contracts. BPA further posits that the term "Industrial Firm Power" is defined in the rate schedule as "electric power that BPA will make continuously available to a direct-service industrial (DSI) purchaser *subject to the terms of the Purchaser's power sales contract* with BPA." From this, BPA concludes that Petitioners are entitled to purchase under the IP–96 rate only that amount of power each has agreed to purchase under the 1981 power sales contracts or the 1996 Block Sales Contracts.

BPA asserts that its interpretation in this regard is fully consistent with the relevant statutes. BPA essentially argues that while Section 5(d) of the Northwest Power Act, 16 U.S.C. § 839c(d), requires the 1981 long term contract sales to DSIs, and may authorize other long term contract sales, Section 5(f), 16 U.S.C. § 839c(f), authorizes BPA to dispose of electric power that is surplus to the following: 1) its contractual obligations to public bodies and private utilities under Section 5(b); 2) its contractual obligations to exchange electric power with public and private utilities under Section 5(c); and 3) its long term contractual obligations with DSIs under section 5(d). BPA asserts that the FPS–96 rate is the rate applicable to all power that is surplus to these contractual obligations, because that rate was established pursuant to Section 7(f) of the Northwest Power Act, 16 U.S.C. § 839e(f), which provides BPA with authority to establish rates "for all other firm power." Inherent in BPA's argument is the assertion that rates established under Section 7(c), 16 U.S.C. § 839e(c), for sales to DSIs only apply to long term sales contracts entered into under Section 5(d), 16 U.S.C. § 839d(c).

Petitioners assert that BPA's interpretation is inconsistent with BPA's prior position in the 1996 Rate ROD, which was used in adopting both the FPS–96 rate and the IP–96 rate. Petitioners dismiss BPA's arguments as post-hoc rationalizations intended to deprive petitioners of their right to purchase additional power under the IP–96 rate. Petitioners argue that in the 1996 Rate ROD, BPA conclusively stated that if a sale could be made under the IP–96 rate, then the sale would be made at the IP–96 rate and not the FPS–96 rate. To support their position, Petitioners quote the following passages from the 1996 Rate ROD:

> Congress did not preclude the sale of power to the DSIs at other rates when necessary to fulfill BPA's mission and when power cannot be sold as Industrial Firm Power.

> \* \* \* \* \*

> Sales to the DSIs at the IP rate and under the FPS rate schedule are neither in competition with each other nor substitutes for one another. BPA will not sell power to the DSIs under the FPS rate schedule if it is able to make the sale at the IP rate.... Any DSI load that BPA obtains under the FPS rate schedule is load it otherwise would have lost to the competition; BPA will make sales to the DSIs under the FPS rate schedule only when the alternative is loss of the load. The FPS rate schedule is not an alternative to the IP–96 rate.

From this, Petitioners conclude that the proper relationship between the IP–96 rate and the FPS–96 rate requires that if BPA can sell power to a DSI under the IP–96 rate it will do so, and will only sell

power to a DSI at the FPS–96 rate if BPA could not sell the power at the IP–96 rate.

While Petitioners' arguments may be viewed as a reasonable interpretation of the 1996 Rate ROD, their interpretation does not prevent BPA's position from also being deemed reasonable. This is especially true given the additional deference accorded to BPA's interpretation regarding matters within its longstanding area of expertise. *See ALCOA I,* 467 U.S. at 389–90, 104 S.Ct. 2472. The fact that BPA indicated the IP and FPS rates are not interchangeable, and it will not make sales under the FPS rate when it can make sales at the IP rate, does not answer the question of when BPA is permitted to make sales under the IP rate. If BPA is not permitted to make sales of Surplus Firm Power under the IP rate, then it is not impermissibly substituting the FPS rate for the IP rate.

Petitioners' argument overlooks prior paragraphs in the 1996 Rate ROD which are of assistance in determining when BPA may sell under the IP–96 rate. These paragraphs, found just prior to the paragraphs quoted by Petitioners, provide:

> Section 7(c) [16 U.S.C. § 839e(c)] should not be extended to sales of additional power to the DSIs. Instead, it [Section 7(c)] establishes the rate for Industrial Firm Power sold under section 5(d) [16 U.S.C. § 839c(d)]. Because the market prevents BPA from selling any additional power to the DSIs under their power sales contract, additional sales do not meet the definition of "Industrial Firm Power."

> BPA's authority to sell power under the FPS rate schedule stems from section 7(f) of the Northwest Power Act [16 U.S.C. § 839e(f)].... Section 7(f)'s reference to "all other firm power" is to power not priced under sections 7(b) or 7(c). Section 7(f) establishes the rate

for power sold to the DSIs under the FPS rate schedule.

These paragraphs instruct that additional power sales to DSIs are not covered by Section 7(c), under which the IP–96 rate was authorized, because that section requires the establishment of rates for DSIs under Section 5(d), the section which provides for the sale of Industrial Firm Power by means of long term contracts with the DSIs. *See* 16 U.S.C. § 839d(1)(B). Because the market prevented BPA from entering into or continuing power sales contracts as provided by Section 5(d), additional sales to the DSIs do not meet the definition of Industrial Firm Power, which is sold only under the power sales contracts provided in Section 5(d). Consequently, additional sales must be pursuant to Section 7(f), which authorized the FPS–96 rate. Since BPA could only use the IP–96 rate to make sales under the 1981 power sales contracts or the 1996 block sales contracts, BPA was not able to sell Surplus Firm Power, which was not covered by those earlier contracts, at the IP rate. *See Portland Gen. Elec. Co. v. Johnson,* 754 F.2d 1475, 1481 (9th Cir.1985) (indicating that each rate set by BPA is available by its own terms to certain customers under certain conditions). Additionally, at least one of the reasons BPA has available surplus firm power is because Petitioners reduced their obligation to purchase power under their previous long term power sales contracts. The sale of the additional firm surplus power is consequently attributable to load BPA otherwise would have lost to competition, and therefore properly subject to the FPS rate schedule, under the reasoning found in the 1996 Rate ROD cited by Petitioners.

The fact that the Preference Act provides Petitioners with a regional preference does not change the result. Under the Preference Act, BPA may sell power

outside the Pacific Northwest, but only if it has surplus energy to do so. *See* 16 U.S.C. § 837a. "Surplus energy" is defined as "electric energy generated at Federal hydroelectric plants in the Pacific Northwest which would otherwise be wasted because of the lack of a market therefor in the Pacific Northwest at any established rate." 16 U.S.C. § 837(c). As previously set forth, the only "established rate" for the Surplus Firm Power offered by BPA is the FPS–96 rate. The Firm Power was termed "surplus," not because it was surplus to the region's needs under 16 U.S.C. § 837a, but because it was surplus to BPA's long term obligations pursuant to 16 U.S.C. § 839c(f). When Petitioners refused to purchase the Surplus Firm Power at the FPS rate, such power became "surplus energy" capable of being sold outside the region. If Petitioners (or some other customer of BPA who is entitled to the regional preference) desired to purchase the Surplus Firm Power at the FPS–96 rate, such power could not have been further classified as "surplus energy," nor sold outside the Pacific Northwest region. Because Petitioners admit they refused to purchase the Surplus Firm Power at the FPS–96 rate, and have not alleged that any other BPA Pacific Northwest client wished to purchase the Surplus Firm Power at the FPS–96 rate, BPA cannot have violated the Preference Act.

Petitioners argue that under the Preference Act, the FPS–96 rate cannot be an established rate because it is a market-driven rate which varies from day to day. Petitioners, however, unnecessarily restrict the definition of "established." Pursuant to 16 U.S.C. § 839e(a), BPA is provided with broad authority to establish rates in conformity with its conflicting obligations. A rate is established if it conforms to the procedures found in 16 U.S.C. § 839e(i). *See APAC,* 126 F.3d at 1176. Petitioners do not dispute that the FPS–96 rate was established pursuant to those

procedures. In fact, pursuant to the FPS–96 Settlement Agreement, Petitioners cannot "challenge the establishment or the confirmation and approval of the FPS–96 rate schedule." Additionally, under the FPS–96 Settlement Agreement, the FPS–96 rate schedule has a rate cap, which provides that "BPA shall not charge more than 63 mills per kilowatt-hour for firm power ... on an annual average basis ... [which is] based on the costs of BPA's highest-cost resource." Accordingly, the FPS–96 rate is "established" even under Petitioners' definition. The FPS–96 is capped at BPA's highest costs and therefore, has an established limit.

Finally, Petitioners argue that BPA's interpretations of the Northwest Power Act and Preference Act are inconsistent with Congressional intent. While the Congressional Record does indicate that these Acts were intended to prevent the wholesale transfer of electric energy from the Pacific Northwest to other regions, it does not support Petitioners' claim that they are also entitled to an absolute price preference. *See* H.R.Rep. No. 88–590 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3342, 3343–44 (expressing concern if "Federal Power generated in the Pacific Northwest is diverted to other Regions"). Any price preference Congress envisioned was embodied in the long term contract rights elucidated in 16 U.S.C. § 839c(d)(1)(B), which Petitioners relinquished.

BPA acted reasonably and in conformity with governing statutes when it offered to sell Surplus Firm Power at the FPS–96 rate, and rejected Petitioners' offers to purchase such power from BPA at the IP–96 rate.

## *ARBITRATION*

■ Kaiser contends that under its 1996 Block Sales Contract it is entitled to arbitrate its dispute with BPA. Kaiser's 1996

Block Sales Contract includes an arbitration clause which provides as follows:

> Upon the written notice from either Party to the other Party, any and all disputes arising under the terms of the Agreement or out of performance under this Agreement are subject to arbitration on any issue, including without limitation, issues of fact, any law relating to performance under this Agreement, and contract interpretation.

Kaiser's 1996 Block Sales Contract also incorporated provisions of the Preference Act and the Northwest Power Act as follows:

> The provisions of section 9(c) and (d) of Public Law 96–501 [the "Northwest Power Act," 16 U.S.C. §§ 839f(c)-(d) ] and the provisions of Public Law 88–552 [the "Preference Act," 16 U.S.C. §§ 837–837h] (the Provisions) as may be amended prior to execution of this Agreement are hereby incorporated by this reference.

> BPA agrees that the Company, together with other companies in the Pacific Northwest, shall have priority to power that BPA has available for sale, in conformity with the Provisions.

Kaiser argues that because the Preference Act and certain provisions of the Northwest Power Act are at issue in this dispute and are incorporated in the 1996 Block Sales Contract, those issues are subject to arbitration under the arbitration clause.

> The Northwest Power Act provides that: Suits to challenge ... final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions ... shall be filed in the United States court of appeals for the region.

16 U.S.C. § 839f(e)(5) (1982). Accordingly, in *CP National Corp. v. Jura*, 876 F.2d 745, 747–48 (9th Cir.1989), we held, regardless of whether petitioners characterize their claims as contract actions, Congress has given us "exclusive jurisdiction over what is in reality a challenge to a final action of BPA taken pursuant to statutory authority." We reasoned that "jurisdiction under the Act should be a function of the agency whose actions are being challenged rather than a function of the cause of action which petitioner asserts." *Id.* at 747 (citation and internal quotation omitted).

Kaiser admits that it is primarily challenging action taken by the BPA pursuant to the Preference Act and the Northwest Power Act. Because Kaiser is challenging BPA action taken under those Acts, Congress has expressly bestowed exclusive jurisdiction to resolve the matter on us. We cannot relinquish that jurisdiction to an arbiter despite Kaiser's characterization of its claim as one for breach of contract. *Cf. CP Nat.*, 876 F.2d at 747–48 (refusing to transfer claim challenging BPA's ratemaking activity to U.S. Claims Court even though petitioner characterized its claim as sounding in contract).

## CONCLUSION

BPA acted reasonably and in accordance with governing statutes when it rejected Petitioners' offers *to purchase* Surplus Firm Power from BPA at the IP–96 rate, and offered to sell the power at the FPS–96 rate. Concomitantly with our exclusive jurisdiction to decide this matter, we dismiss Kaiser's, ALCOA's and Vanalco's petitions.

**PETITIONS DISMISSED.**