**BEST POWER TECHNOLOGY SALES CORPORATION, Appellant,**

v.

**Richard G. AUSTIN, Administrator, General Services Administration, Appellee.**

**BEST POWER TECHNOLOGY SALES CORPORATION, Appellee,**

v.

**Richard. G. AUSTIN, Administrator, General Services Administration, Appellant.**

**Nos. 92–1118, 92–1254.**

United States Court of Appeals, Federal Circuit.

Jan. 21, 1993.

Gerard F. Doyle, Doyle & Backman, Washington, DC, argued for appellant. With him on the brief was Ron R. Hutchinson. Of counsel was Pamela J. Reiner.

Thomas D. Dinackus, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and James M. Kinsella, Asst. Director. Also on the brief were Stuart Young, Christine Williams and Seth Binstock, Office of General Counsel, General Services Admin., of counsel.

Before NIES, Chief Judge, MAYER and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

Best Power Technology Sales Corporation (Best) appeals a final decision of the General Services Administration (GSA) Board of Contract Appeals (GSBCA or Board).[1] In that decision, the GSBCA denied Best's protest of GSA's rejection of Best's offer to enter into a contract under GSA's Multiple-award Schedule (MAS) program to provide uninterruptible power supplies (UPSs).[2]

For its part, the government appeals the GSBCA's holding that it had jurisdiction under the Brooks Act, 40 U.S.C. § 759 (1988) (the Act), to hear Best's protest. Alternatively, the government urges us to affirm the GSBCA's denial of the protest.

Because we conclude that the GSBCA did not have jurisdiction to hear Best's protest, we reverse and remand with directions to dismiss the protest. We do not reach the merits.

1. *Best Power Technology Sales Corp.,* GSBCA No. 11400–P, 1991 BPD (Fed. Publications) ¶ 318, 1991 WL 239539 (Gen.Servs.Admin.B.C.A. Nov. 13, 1991).

2. In this opinion, Cross–Appellant Richard G. Austin, Administrator of GSA, is referenced as "GSA."

## I. BACKGROUND

MASs are part of GSA's Federal Supply Schedule program, which "provides Federal agencies with a simplified process of acquiring commonly used supplies and services in varying quantities." 48 C.F.R. § 38.-101(a)(1991). Under the MAS program, contracts are negotiated and awarded by GSA to manufacturers and suppliers of the same generic types of supplies and services at specific prices. 48 C.F.R. § 38.102-2(a)(1991). GSA uses MAS contracts when "(1) it is not practical to draft specifications or other descriptions for the required supplies or services and there are multiple suppliers able to furnish similar commercial supplies or services; ... or (2) selectivity is necessary for ordering offices to meet their varying needs." 48 C.F.R. § 38.102-2(b) (1991). Once a manufacturer or supplier has been awarded a MAS contract for a particular type of supply or service, that manufacturer's or supplier's product is placed on the MAS for that supply or service at a particular price.

Several manufacturers or suppliers of different but comparable products may simultaneously have contracts under one MAS, if each offers the best price for a supply or service which has unique features. An agency can then choose, from the MAS, the supply or service with the features it needs and purchase that supply or service on the terms that GSA has previously negotiated with the particular manufacturer or supplier.

UPSs (or UPS units) are items for which the government has a need. A UPS protects the equipment to which it is connected from the effects of a power interruption by automatically sending power from its (the UPS's) batteries to the connected equipment whenever the normal flow of current from power lines is interrupted. UPSs are used to ensure a steady flow of "clean" power to any connected equipment which the user desires to be unaffected by power failures and fluctuations.

Prior to 1989, GSA negotiated MAS contracts for UPSs under two separate schedules: Federal Stock Classification (FSC) Group 66, Part II, section K (instruments and laboratory supplies), in which UPSs were classified as "ADPE support equipment"; and FSC Group 70, Part I, sections B and C (general purpose automatic data processing equipment, end-user computers, equipment used primarily off line, and software). In 1989, to correct what it termed "the erroneous classification" of UPSs under the MAS program, GSA removed the UPS categories from FSC Group 66 and FSC Group 70 and created a single UPS category in FSC Group 61 (Electric Line and Power Distribution Equipment), beginning March, 1991. GSA Internal Mem. (Jan. 6, 1989).

On July 27, 1990, GSA issued Amendment No. 2 of Solicitation 7FXI-86-88-6109-B under FSC Group 61 (the Solicitation). The Solicitation invited offers for MAS contracts to furnish to government agencies the supplies and services listed in the Solicitation. UPSs were among the items of equipment for which contracts were sought. Specifically, Item 412-14 of the Solicitation, under "New Items," called for "Uninterruptible Power Supplies," without further explanation.

Best manufactures UPS units specifically designed for use with data processing equipment. While other companies also make UPS products for data processing equipment, Best's products are intelligent and interactive. They can monitor a protected device and, if necessary, shut it down in an orderly fashion, thereby preventing data stored in the protected device from being lost.

Best submitted an initial proposal in response to the Solicitation on August 24, 1990. In the proposal, Best offered its full line of UPS products. After the proposal was submitted, GSA and Best entered into negotiations over the prices at which Best would offer its products to government users if a contract was signed and the products were placed on the MAS. Under the MAS program, GSA's policy is to seek a discount equal to or greater than the discount which the supplier offers to its best customers. See GSA's 1982 Multiple-award Schedule Policy Statement, 47 Fed. Reg. 50,242, 50,244, Nov. 5, 1982. Conse-

quently, the focus of the negotiations between GSA and Best was upon GSA's insistence that Best give the government the same discount Best gives its two largest customers. On August 1, 1991, following Best's continued refusal to offer the government the same discount it gives these customers, GSA rejected Best's best and final offer of June 18, 1991, and refused to place Best's products on the MAS. Best protested the rejection to the GSBCA on August 14, 1991, purportedly pursuant to the Brooks Act.

In response to the protest, GSA argued that the GSBCA was without jurisdiction because the Solicitation was not subject to the Brooks Act, while, on the merits, GSA contended that it had properly rejected Best's offer. The Board rendered its decision on November 13, 1991. After concluding that it did have jurisdiction under the Brooks Act, the GSBCA denied Best's protest. Best's appeal and the government's cross appeal to this court followed.

## II. DISCUSSION

### A.

The Brooks Act states that the GSBCA has jurisdiction to hear protests "in connection with any procurement conducted which is subject to [the Act]." 40 U.S.C. § 759(f)(1) (1988). At the same time, the Act authorizes GSA "to coordinate and provide for the economic and efficient purchase, lease, and maintenance of automatic data processing equipment [ADPE] by Federal agencies." 40 U.S.C. § 759(a)(1) (1988). Thus, a given procurement is subject to the Act—and therefore to the GSBCA's jurisdiction over any protest arising therefrom—if it is one for ADPE.

In holding that it had jurisdiction under the Brooks Act to hear Best's protest, the GSBCA stated:

> The protester's products are designed solely to be interconnected with computers and they automatically acquire, store, control, manipulate and display data and information. The General Services Ad-

ministration solicited "uninterruptible power supplies." The products solicited were not further qualified in any way. That description included, and hence solicited, products having no relation or use with ADPE [automatic data processing equipment] as well as many products designed and purchased exclusively for use with computers. It is the latter that are involved in this protest. Therefore, we conclude that the protester's UPS products are ancillary equipment within the meaning of the Brooks Act definition of ADPE.

1991 BPD (Fed.Publications) ¶ 318, p. 9.

In this case, we must determine, as a preliminary matter, whether the board used the correct approach in deciding the question of whether Best's protest was in connection with a procurement which was subject to the Act. As seen above, in addressing the jurisdictional issue, the GSBCA looked to the products which Best offered in response to the Solicitation, rather than to the nature of the Solicitation. This was error. In determining whether it had jurisdiction under the Brooks Act to hear Best's protest, the GSBCA should have looked to the nature of the products specified in the Solicitation rather than to the products which Best offered in response to the Solicitation.

In focusing its inquiry upon the characteristics of Best's UPSs, the GSBCA ignored the statutory scheme, which vests ADPE procurement authority in GSA.[3] Under the Board's approach, an offeror could create GSBCA jurisdiction over a non-ADPE procurement by responding to a solicitation for non-ADPE items by offering products having characteristics of ADPE. In this way, offerors in effect could undermine the procurement authority which the Brooks Act gives to GSA. We are not prepared to accept an interpretation of the statute which would yield such a result. *See Haggar Co. v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 339, 84 L.Ed. 340 (1940) ("All statutes must be construed in light of their purpose. A reading of

---

3. The Act is replete with references to GSA's procurement authority. *See, e.g.,* 40 U.S.C. §§ 759(b)(2), 759(f)(2)(A), 759(f)(3)(A), 759(f)(5)(B) (1988).

them which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with legislative purpose.") Beyond that, we need only add that if Congress had intended the approach used by the GSBCA below—determining its jurisdiction on the basis of the products offered by the protester rather than on the basis of the products specified in the Solicitation—it would have made that intention clear in the language of the Act. *See, e.g., United States v. International Business Mach. Corp.*, 892 F.2d 1006, 1009 (Fed.Cir.1989). ("Had Congress intended to make the exemptions permanent, it knew how: it could and we believe would have used words of futurity ...."). In sum, we hold that when the GSBCA, in deciding whether it has jurisdiction over a bid protest, addresses the question of whether a given procurement is one for ADPE, it must look to the nature of the items called for in the Solicitation, rather than to the nature of the items that a protester offers in a response to the Solicitation.

## B.

We turn now to the procurement at issue here. Pursuant to the authority which has been given to it under the Brooks Act, GSA has issued the Federal Information Resources Management Regulation (FIRMR). 41 C.F.R. §§ 201–1.000, 201–1.003(a) (1991). The FIRMR applies to "[t]he acquisition, management, and use of FIP [Federal information processing] resources by Federal agencies." 41 C.F.R. § 201–1.002–1(a) (1991). From time to time, GSA supplements the FIRMR with bulletins, handbooks, and reports, in order to provide guidance and information on the regulation. 41 C.F.R. § 201–3.001(b) (1991).

As used in the FIRMR, the term "FIP resources" means "automatic data processing equipment," as defined in the Brooks Act. 41 C.F.R. § 201–4.001 (1991). In the exercise of its statutory authority, GSA has excluded UPSs from the definition of "FIP

resources" (and thus from the definition of "ADPE"). *See* 41 C.F.R. § 201–4.001 (1991), FIRMR Bulletin A–1 (Jan. 31, 1991).[4] Consistent with this approach, GSA removed the UPS category from FSC Groups 66 and 70 of the MAS program in 1989 and created a single UPS category in FSC Group 61 of the MAS program. Additionally, in the past, GSA has taken the position before the GSBCA that UPSs are not automatic data processing equipment within the meaning of the Brooks Act. *See Liebert Corp.*, GSBCA No. 11300–P, 1991 BPD (Fed. Publications) ¶ 196, 1991 WL 168722 (Gen.Servs.Admin.B.C.A. Aug. 23, 1991).

The Supreme Court has provided guidance on the approach to be followed when an agency has been given authority to administer a statute. The Court has stated that "the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982). The Court also has stated: "To uphold [the agency's interpretation] 'we need not find that [its] construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' ... We need only conclude that it is a reasonable interpretation of the relevant provisions." *American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 422–423, 103 S.Ct. 1921, 1933, 76 L.Ed.2d 22 (1983) (quoting *Unemployment Compensation Comm'n v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946)), *quoted in Aluminum Co. of Am. v. Central Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 389, 104 S.Ct. 2472, 2479, 81 L.Ed.2d 301 (1984).

Thus, in addressing the jurisdictional issue, the question we must decide is whether, giving due deference to GSA's interpretation of the Brooks Act, it was reasonable for GSA to determine that UPSs are not automatic data processing equipment with-

---

**4.** FIRMR bulletins are published in appendix B of the looseleaf addition of the FIRMR. 41 C.F.R. § 201–3.001(b) (1991).

in the meaning of the Act and that, therefore, Item 412–14 of the Solicitation did not constitute a procurement "subject to the Act." We conclude that it was.

The Brooks Act defines "ADPE" as "any equipment or interconnected system or subsystems of equipment that is used in the automatic acquisition, storage, manipulation, management, movement, control, display, switching interchange, transmission, or reception, of data or information." 40 U.S.C. § 759(a)(2)(A) (1988). The Act goes on to state, in pertinent part, that ADPE includes "(i) computers; (ii) ancillary equipment; (iii) software, firmware, and similar procedures." 40 U.S.C. § 759(a)(2)(B) (1988).

UPSs are plainly not the kind of equipment that is described in the basic definition of "ADPE" in section 759(a)(2). Neither are UPSs "computers" or "software, firmware, or similar procedures," as listed in section 759(a)(2)(B). The only question that remains then is whether UPSs are "ancillary equipment."

■ The Brooks Act does not define "ancillary equipment." It is a basic principle of statutory interpretation, however, that undefined terms in a statute are deemed to have their ordinarily understood meaning. *United States v. James*, 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986) ("[We] assume that the legislative purpose is expressed by the ordinary meaning of the words used."). For that meaning, we look to the dictionary. *See, e.g., Board of Educ. v. Mergens*, 496 U.S. 226, 237, 110 S.Ct. 2356, 2365, 110 L.Ed.2d 191 (1990). As far as the term "ancillary equipment" is concerned, the key word is "ancillary." The dictionary defines "ancillary" as follows: "SUBORDINATE, SUBSIDIARY,.... AUXILIARY, RELATED,.... SUPPLEMENTARY." Webster's Third New International Dictionary, Unabridged

80 (1986). The dictionary definition of the word "ancillary," along with examples that are given in the definition, points to something that, in terms of its function or purpose, is part of, or is related to, something else. Accordingly, we conclude that when Congress used the term "ancillary equipment" in the Brooks Act, it had in mind equipment that, in terms of its function or purpose, is part of, or is related to, ADPE. Indeed, it is just such equipment that GSA has classified as "ancillary equipment." [5]

■ We fail to see how UPSs can be "ancillary equipment" under the Act. A UPS is not a piece of equipment that, in terms of its function or purpose, is part of, or is related to, another piece of equipment. Rather, it is a piece of equipment that is connected to another piece of equipment to assure that the other piece of equipment will continue to operate. The principal purpose of a UPS is to assure the uninterrupted supply of power to the equipment to which it is connected. As already seen, a UPS protects the equipment to which it is connected from the effects of a power interruption by automatically sending power from its (the UPS's) batteries to the connected equipment, whenever the normal flow of power is interrupted. The GSBCA heard testimony that UPSs are used wherever the benefit of preventing power interruption is greater than the cost of the UPS. UPSs thus have many different applications. As is the case with Best's products, they may be used to protect computers, or they may be used to protect other kinds of equipment, such as machine tools. The UPSs involved in *Liebert*, for example, were designed to provide uninterruptible power to an entire facility, thereby supporting both ADPE and non-ADPE functions.

In sum, there is ample support for GSA's determination that UPSs are not automatic data processing equipment within the

---

**5.** FIRMR Bulletin A–1 states as follows:
Automatic data processing equipment includes the following:

\* \* \* \* \* \*

b. Ancillary equipment, such as disk drives, plotters, printers, storage and backup devices cable connected to computers, digital imaging equipment, optical storage and/or retrieval equipment, source data automation/recording equipment (e.g. optical character recognition devices, computer-generated microfilm and other data acquisition devices), punched card accounting equipment, and office automation equipment that was designed for use in conjunction with or controlled by a computer system....

meaning of the Brooks Act. Accordingly, we conclude that it was reasonable for GSA to determine that Item 412–14 of the Solicitation did not constitute a procurement "subject to" the Act. Thus, the GSBCA erred in holding that it had jurisdiction over Best's protest.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the GSBCA and hold that the GSBCA had no jurisdiction over Best's protest. All decisions and orders of the GSBCA in these proceedings are therefore vacated. The case is remanded to the GSBCA with the instruction to dismiss.

## COSTS

No costs.

REVERSED, VACATED, REMANDED WITH INSTRUCTION TO DISMISS.

NIES, Chief Judge, additional views.

I join Judge Schall's well reasoned opinion respecting the absence of GSA's jurisdiction over the protest. GSA was not seeking to procure automatic data processing equipment and thus the anticipated procurement was not under the Brooks Act. I write only to explain that the expression "MAS contract" is GSA terminology and I agree with its use only as a matter of convenience. It is my understanding that an "MAS contract" obligates neither the government to buy goods nor the contractor to sell goods. An award of an "MAS contract" merely places the contractor's name on a list of sources from which agencies *may* place specific orders without going through the competitive bid process anew. I therefore question denominating the acceptance for the MAS listing of contractors offering to supply particular goods if ordered as a "contract." *See Modern Sys. v. United States,* 979 F.2d 200 (Fed. Cir.1992). This issue was not briefed and it is only of peripheral interest in this case. I see no reason to explore the matter further in view of our disposition here. However, the opinion cannot be read as a pronouncement that what GSA calls an "MAS contract" is in fact a binding agreement.